# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 5, 2007 Session

## TONY CARRUTHERS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-25948     Walter C. Kurtz, Judge, Sitting by Designation**

---

**No. W2006-00376-CCA-R3-PD  - Filed December 12, 2007**

---

The petitioner, Tony Carruthers, appeals the denial of his petition for post-conviction relief. In April 1996, a Shelby County jury convicted the petitioner of the first degree murders of Marcellos Anderson, Delois Anderson, and Frederick Tucker and imposed a sentence of death for each conviction. The Tennessee Supreme Court affirmed the convictions and sentences on direct appeal. State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000). In December 2001, the petitioner filed a *pro se* petition for post-conviction relief. By order entered April 16, 2002, the supreme court appointed a Davidson County post-conviction court to preside over the case. Post-conviction counsel was appointed and an evidentiary hearing was subsequently conducted on various dates between August 29, 2005, and November 3, 2005. On February 2, 2006, the post-conviction court entered an order denying the petition. On appeal to this court, the petitioner raises issues of ineffective assistance of pretrial and appellate counsel and prosecutorial misconduct. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Larry E. Copeland, Jr., Memphis, Tennessee; William T. Ramsey, James G. Thomas, and J. Aaron Morris, Nashville, Tennessee, for the appellant, Tony Carruthers.[1]

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Elizabeth T. Ryan, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1]The court thanks the petitioner's counsel for their dedicated and exhaustive efforts on his behalf, especially in view of the very large and complicated record in this matter.

# OPINION

## FACTS UNDERLYING THE PETITIONER'S CONVICTIONS

The facts underlying the petitioner's convictions and sentences are set forth in our supreme court's direct appeal opinion in this case:

### *The Guilt Phase*

The proof introduced at the guilt phase of the trial showed that one of the victims, Marcellos Anderson, was heavily involved in the drug trade, along with two other men, Andre "Baby Brother" Johnson and Terrell Adair. Anderson wore expensive jewelry, including a large diamond ring, carried large sums of money on his person, and kept a considerable amount of cash in the attic of the home of his mother, victim Delois Anderson. When his body was discovered, Anderson was not wearing any jewelry and did not have any cash on his person. Anderson was acquainted with both defendants, and he considered Carruthers to be a trustworthy friend. The proof showed that Anderson's trust was misplaced.

In the summer of 1993 Jimmy Lee Maze, Jr., a convicted felon, received two letters from Carruthers, who was then in prison on an unrelated conviction. In the letters, Carruthers referred to "a master plan" that was "a winner." Carruthers wrote of his intention to "make those streets pay me" and announced, "everything I do from now on will be well organized and extremely violent." Later, in the fall of 1993, while incarcerated at the Mark Luttrell Reception Center in Memphis awaiting his release, Carruthers was assigned to a work detail at a local cemetery, the West Tennessee Veterans' Cemetery. At one point, as he helped bury a body, Carruthers remarked to fellow inmate Charles Ray Smith "that would be a good way, you know, to bury somebody, if you're going to kill them. . . . [I]f you ain't got no body, you don't have a case."

Smith also testified that he overheard Carruthers and Montgomery, who also was incarcerated at the Reception Center, talking about Marcellos Anderson after Anderson had driven Carruthers back to the Reception Center from a furlough. According to Smith, when Montgomery asked Carruthers about Anderson, Carruthers told him that both Anderson and "Baby Brother" Johnson dealt drugs and had a lot of money. Carruthers said he and Montgomery could "rob" and "get" Anderson and Johnson once they were released from prison.

When Carruthers was released from the Department of Correction on November 15, 1993, he left the Reception Center with Anderson. Carruthers accompanied Anderson to Andre Johnson's house, and received a gift of $200 cash from Anderson, Johnson, and Terrell Adair, who was present at Johnson's house.

One month later, on December 15, 1993, Smith was released from the Department of Correction. Upon his release, Smith warned Anderson and Johnson of Carruthers' and Montgomery's plans to "get them." According to Smith and Johnson, Anderson did not take the warning or the defendants' threats seriously.

In mid-December 1993, Maze, his brother and Carruthers were riding around Memphis together. They came upon Terrell Adair's red Jeep on the street in front of Delois Anderson's home where a drive-by shooting had just occurred. Adair had been injured in the shooting and was in the hospital. Jonathan "Lulu" Montgomery, James Montgomery's brother, was at the scene of the shooting, and he joined Carruthers in the back seat of Maze's car. According to Maze, Carruthers remarked to Jonathan that, "it would be the best time to kidnap Marcellos," and Jonathan asked, "which one Baby Brother or Marcellos?" Carruthers then nudged Montgomery with his elbow and said "it" was going to take place after James Montgomery was released from prison. About two weeks later, on December 31, Maze saw Carruthers loading three antifreeze containers into a car, and Carruthers indicated to Maze that the containers were filled with gasoline.

On January 11, 1994, James Montgomery was released from prison. After his release, Montgomery told "Baby Brother" Johnson that he, not Johnson, was in charge of the neighborhood. Montgomery said, "It was my neighborhood before I left, and now I'm back and its my neighborhood again." Montgomery asked Johnson if he wanted to "go to war about this neighborhood." When Johnson said, "no," Montgomery replied "You feeling now like I'm about to blow your motherf-----g brains out" and "you all need to get in line around here or we're going to war about this." Near the end of January or the first of February 1994, Johnson and Adair saw the defendants sitting together in an older model grey car down the street from Johnson's mother's home. It was late at night, between 11 p.m. and 1 a.m. When the defendants approached Johnson and Adair, Montgomery asked why they thought he was trying to harm them. Montgomery told them, "Look, I told you, we ain't got no problem with nobody in this neighborhood. We already got our man staked out. If we wanted some trouble or something, we got you right now. We'd kill your whole family." Confirming Montgomery's statement, Carruthers told them, "We already got our man staked out. You all right. If it's any problem, we'll deal with it later." Montgomery explained that he intended to take the "man's" money and drugs, and said, "if the police didn't have no body, they wouldn't have no case."

On February 23, 1994, Marcellos Anderson borrowed a white Jeep Cherokee from his cousin, Michael Harris. Around 4:30 on the afternoon of February 24, 1994, witnesses saw Marcellos Anderson and Frederick Tucker riding in the Jeep Cherokee along with James and Jonathan Montgomery. About 5 p.m. that day, James and Jonathan Montgomery and Anderson and Tucker arrived in the Jeep Cherokee at the house of Nakeita Shaw, the Montgomery brothers' cousin. Nakeita Shaw, her four

children, and Benton West, also her cousin, were present at the house when they arrived.

The four men entered the house and went downstairs to the basement. A short time later, James Montgomery came back upstairs and asked Nakeita Shaw if she could leave for a while so he could "take care of some business." Nakeita Shaw told West that she thought "they" were being kidnapped, and then she left the house with West and her children. West agreed to care for Nakeita Shaw's children while she attended a meeting.

When Nakeita Shaw returned home after the meeting, she saw only Carruthers and James Montgomery. Montgomery asked her to go pick up her children and to "stay gone a little longer." Nakeita Shaw returned home with her children before 10 p.m. The Jeep Cherokee was gone, but James Montgomery and Carruthers were still present at her home. Montgomery told Nakeita Shaw to put her children to bed upstairs and remain there until he told her he was leaving. Sometime later, Montgomery called out to Nakeita Shaw that he was leaving. She returned downstairs and saw James Montgomery, Carruthers, and the two victims, Anderson and Tucker, leave in the Jeep Cherokee. Prior to trial, Nakeita Shaw told the police that Anderson's and Tucker's hands were tied behind their backs when they left her house. While she admitted making this statement, she testified at trial that the statement was false and that she had not seen Anderson's and Tucker's hands tied when they left her home.

In the meantime, around 8 p.m. on February 24, Laventhia Briggs telephoned her aunt, victim Delois Anderson. When someone picked up the telephone but said nothing, Briggs hung up. Briggs called "a couple of more times" but received no answer. Briggs was living with Delois Anderson at the time and arrived at her aunt's home around 9:00 p.m. Although Delois Anderson was not home, her purse, car, and keys were there. Food left in Anderson's bedroom indicated that she had been interrupted while eating. Briggs went to bed, assuming her aunt would return home soon. A co-worker, whom Delois Anderson had driven home around 7:15 p.m., was the last person to have seen her alive.

Chris Hines, who had known the defendants since junior high school, testified that around 8:45 p.m. on February 24, 1994, Jonathan Montgomery "beeped" him. Jonathan said, "Man, a n----r got them folks." When Hines asked, "What folks?" Jonathan replied, "Cello and them" and said something about stealing $200,000. Jonathan then indicated that he could not talk more on the telephone and arranged to meet Hines in person. Jonathan arrived at Hines' home at about 9:00 p.m. and told him, "Man, we got them folks out at the cemetery on Elvis Presley, and we got $200,000. Man, a n----r had to kill them folks." At that point, James Montgomery "beeped in" and talked with Jonathan. When the telephone call ended, Jonathan

-4-

asked Hines to drive him to the cemetery. Hines refused, but he allowed Jonathan to borrow his car, which Jonathan promised to return in an hour. When the car was not returned, Hines called James Montgomery's cellular telephone at around 11 p.m. James told Hines that he did not know where Jonathan was, that Jonathan did not have a driver's license, and that the car should be returned by 4 a.m. because Jonathan was supposed to drive James to his girlfriend's house.

The Jeep Cherokee that Anderson had borrowed was found in Mississippi on February 25 around 2:40 a.m. It had been destroyed by fire. About 3:30 a.m., after he was informed of the vehicle fire by law enforcement officials, Harris telephoned Delois Anderson's home, and Laventhia Briggs then discovered that neither her aunt Delois nor her cousin Marcellos had returned home. Briggs filed a missing person report with the police later that day.

The Montgomery brothers and Carruthers did not return Hines' car until approximately 8:30 a.m. on February 25. The car was very muddy. Hines drove James Montgomery and Carruthers to Montgomery's mother's home and then drove away with Jonathan Montgomery. That morning Jonathan, whom Hines described as acting "paranoid" and "nervous," repeatedly told Hines that "they had to kill some people." About two hours later, James Montgomery and Carruthers came to Hines' home looking for Jonathan. Hines advised Carruthers and James Montgomery that he was celebrating his birthday, and he asked James Montgomery to give him a birthday present. James agreed to give Hines twenty dollars after he picked up his paycheck, and James also agreed to have Hines' car washed immediately as a birthday present.

Hines, the Montgomery brothers, and Carruthers drove to a carwash, and James Montgomery paid an unidentified elderly man to clean the car. The man cleaned the interior of the car and the trunk of the car. Neither Carruthers nor James Montgomery supervised the cleaning of the car. After Jonathan Montgomery abruptly left the carwash, Carruthers and James Montgomery asked Hines what Jonathan had told him, but Hines did not tell them. Several days later James Montgomery came to Hines' home and offered Hines an AK-47 assault rifle because Montgomery said he had "heard that Hines was into it with some people on the street." James Montgomery told Hines the rifle had "blood on it." Hines testified that he interpreted this statement to mean that someone had been shot with the weapon.

On March 3, 1994, about one week after a missing person report was filed on Delois and Marcellos Anderson, Jonathan Montgomery directed Detective Jack Ruby of the Memphis Police Department to the grave of Dorothy Daniels at the Rose Hill Cemetery on Elvis Presley Boulevard. Daniels' grave was located six plots away from the grave site of the Montgomery brothers' cousin. Daniels had been buried on

February 25, 1994. Pursuant to a court order, Daniels' casket was disinterred, and the authorities discovered the bodies of the three victims buried beneath the casket under several inches of dirt and a single piece of plywood.

An employee of the cemetery testified that a pressed wood box or vault had been placed in Daniels' grave during working hours on February 24 and that it would have taken at least two people to remove the box. Daniels' casket had been placed in the grave inside the box on February 25, and, according to Dr. Hugh Edward Berryman, one of the forensic anthropologists who assisted in the removal of the bodies from the crime scene, there was no evidence to suggest that Daniels' casket had been disturbed after she was buried. Thus, it can be inferred that the bodies of the three victims were placed in the grave and covered with dirt and a piece of plywood prior to the casket being placed in the grave.

Dr. O.C. Smith, who helped remove the bodies from the grave and who performed autopsies on the victims, testified that, when found, the body of Delois Anderson was lying at the bottom of the grave and the bodies of the two male victims were lying on top of her. The hands of all three victims were bound behind their backs. Frederick Tucker's feet were also bound and his neck showed signs of bruising caused by a ligature. A red sock was found around Delois Anderson's neck. Marcellos Anderson was not wearing any jewelry. Dr. Smith testified that Delois Anderson died from asphyxia caused by several factors: the position of her head against her body, dirt in her mouth and nose, and trauma from weight on her body. Frederick Tucker had received a gunshot wound to his chest, which would not have been fatal had he received medical care. He had also suffered injuries from blunt trauma to his abdomen and head resulting in broken ribs, a fractured skull, and a ruptured liver. Dr. Smith opined that Tucker was shot and placed in the grave, where the force of compression from being buried produced the other injuries and, along with the gunshot wound, caused his death. According to Dr. Smith, Marcellos Anderson had been shot three times: a contact wound to his forehead that was not severe and two shots to his neck, one of which was also not serious. However, the gunshot causing the other neck wound had entered Anderson's windpipe and severed his spinal cord, paralyzing him from the neck down. This wound was not instantaneously fatal. Anderson had also suffered blunt trauma to his abdomen from compression forces. Dr. Smith opined that each victim was alive when buried.

Defendant James Montgomery presented no proof. Carruthers, acting pro se, called several witnesses to rebut the testimony offered by the State, primarily by attacking the credibility of the State's witnesses.

A health administrator at the Mark Luttrell Reception Center testified that, because of an injury to his arm, Carruthers had been given a job change on October 6, 1993, and had not worked at the cemetery after that date. Another official at the

-6-

Reception Center testified that Carruthers was not released on furlough after Montgomery arrived at the Reception Center on November 4, 1994. This proof was offered to impeach Smith's testimony that Montgomery and Carruthers discussed robbing and getting Marcellos Anderson after Anderson drove Carruthers back to the Reception Center following a furlough. An investigator appointed to assist Carruthers with his defense testified that he had interviewed Maze, who admitted he did not know anything about the "master plan" to which Carruthers referred in the letters until Carruthers was released from prison. On cross-examination, the investigator admitted that Maze said that when he was released from prison, Carruthers had explained that the master plan involved kidnapping Marcellos Anderson. Carruthers' brother and another witness testified that Jonathan Montgomery was not at the scene of the drive-by shooting involving Terrell Adair. This proof was offered to impeach Maze's testimony that Carruthers and Jonathan Montgomery discussed kidnapping Marcellos on the day that Terrell Adair was shot. Another witness, Aldolpho Antonio James testified that he and Carruthers had been visiting a friend between the hours of 1:00 a.m. and 2:00 a.m. the day before these homicides were first reported on the news. This testimony was offered to provide at least a partial alibi for Carruthers for the early morning hours of February 25, 1994. However, on cross-examination, James admitted that he did not know the exact date he and Carruthers had been together.

Carruthers also called Alfredo Shaw as a witness. After seeing a television news report about these killings in March of 1994, Alfredo Shaw had telephoned CrimeStoppers and given a statement to the police implicating Carruthers. Alfredo Shaw later testified before the grand jury which eventually returned the indictments against Carruthers and Montgomery. Prior to trial, however, several press reports indicated that Alfredo Shaw had recanted his grand jury testimony, professed that the statement had been fabricated, and intended to formally recant his grand jury testimony when called as a witness for the defense. Therefore, when Carruthers called Alfredo Shaw to testify, the prosecution announced that if he took the stand and recanted his prior sworn testimony, he would be charged with and prosecuted for two counts of aggravated perjury. In light of the prosecution's announcement, the trial court summoned Alfredo Shaw's attorney and allowed Alfredo Shaw to confer privately with him. Following that private conference, Alfredo Shaw's attorney advised the trial court, defense counsel, including Carruthers, and the prosecution, that Alfredo Shaw intended to testify consistently with his prior statements and grand jury testimony and that any inconsistent statements Alfredo Shaw had made to the press were motivated by his fear of Carruthers and by threats he had received from him.

Despite this information, Carruthers called Alfredo Shaw as a witness and as his attorney advised, Shaw provided testimony consistent with his initial statement to the police and his grand jury testimony. Specifically, Alfredo Shaw testified that

he had been on a three-way call with Carruthers and either Terry or Jerry Durham, and during this call, Carruthers had asked him to participate in these murders, saying he had a "sweet plan" and that they would each earn $100,000 and a kilogram of cocaine. Following his arrest for these murders, Carruthers was incarcerated in the Shelby County Jail along with Alfredo Shaw, who was incarcerated on unrelated charges. Carruthers and Alfredo Shaw were in the law library when Carruthers told Alfredo Shaw that he and some other unidentified individuals went to Delois Anderson's house looking for Marcellos Anderson and his money. Marcellos was not there when they arrived, but Carruthers told Delois Anderson to call her son and tell him to come home, "it's something important." When Anderson arrived, the defendants forced Anderson, Tucker, who was with Anderson, and Delois Anderson into the jeep at gunpoint and drove them to Mississippi, where the defendants shot Marcellos Anderson and Tucker and burned the jeep. According to Alfredo Shaw, the defendants then drove all three victims back to Memphis in a stolen vehicle. Alfredo Shaw testified that, after they put Marcellos Anderson and Tucker into the grave, Delois Anderson started screaming and one of the defendants told her to "shut up" or she would die like her son and pushed her into the grave. Carruthers also told Alfredo Shaw that the bodies would never have been discovered if "the boy wouldn't have went and told them folks." Carruthers told Alfredo Shaw that he was not going to hire an attorney or post bond because the prosecution would then learn that the murders had been a "hit." Carruthers told Alfredo Shaw that Johnson also was supposed to have been "hit" and that Terry and Jerry Durham were the "main people behind having these individuals killed." Carruthers said that the Durhams wanted revenge because Anderson and Johnson had previously stolen from them.

In response to questioning by Carruthers, Alfredo Shaw acknowledged that he had told the press that his statement to police and his grand jury testimony had been fabricated, but said he had done so because Carruthers had threatened him and his family. According to Alfredo Shaw, one of Carruthers' investigators had arranged for a news reporter to speak with him about recanting his grand jury testimony.

As impeachment of his own witness, Carruthers called both Jerry and Terry Durham, twin brothers, as witnesses. The Durhams denied knowing Alfredo Shaw and said they had never been party to a three-way telephone call involving Alfredo Shaw and Carruthers. Carruthers also called attorney AC Wharton who testified that he was initially retained by Carruthers' mother to represent her son on these murder charges, but was required to withdraw because of a conflict of interest. This testimony was offered to impeach Alfredo Shaw's statement that Carruthers had said he was not going to hire an attorney or post bond. Finally, Carruthers called an administrative assistant from the Shelby County jail who testified that jail records, indicated that Alfredo Shaw was not in the law library at the same time as Carruthers in either February or March of 1994. According to jail records, Alfredo Shaw was

-8-

in protective custody for much of that time and, as a result, would have been escorted at all times by a guard. However, on cross-examination, this witness admitted that the jail records regarding the law library were not always complete or accurate and that Alfredo Shaw had been housed outside of protective custody from mid-March to early April 1994 which would have afforded him the opportunity to interact with Carruthers. The record reflects that Alfredo Shaw came forward and provided a statement to police on March 27, 1994 and that the indictments were returned on March 29, 1994.

Based upon this proof, the jury found each defendant guilty beyond a reasonable doubt of three counts of first degree murder, three counts of especially aggravated kidnapping, and one count of especially aggravated robbery.

### *The Sentencing Phase*

The trial proceeded to the sentencing phase. The State relied upon the proof presented during the guilt phase of the trial and also introduced evidence to show that Carruthers had been previously convicted of aggravated assault and that James Montgomery had two previous convictions for robbery with a deadly weapon and one conviction for assault with intent to commit robbery with a deadly weapon. The proof showed that Montgomery was only seventeen years old at the time he committed these previous offenses and that all of these previous convictions arose from a single criminal episode.

The State also recalled Dr. Smith who testified that none of the victims died instantaneously and that all suffered as a result of their separate injuries and being buried alive. Although Anderson was paralyzed below his chest, Dr. Smith testified that he would have felt some of the effects of the trauma to his airway and particularly his windpipe, which is according to Dr. Smith, a very painful injury. According to Dr. Smith, the bullet wound to Anderson's head would not have been fatal had he received proper medical attention and would not necessarily have caused unconsciousness. In addition, Anderson would have been able to breathe after the spinal cord wound, but the wound would have bled into his airway and his lungs, making breathing very difficult. Dr. Smith said that Anderson literally would have been "drowning on his own blood."

With respect to Frederick Tucker, Dr. Smith testified that the gunshot wound to his chest fractured two ribs and pierced his lung, but would not have been fatal had he obtained medical treatment. Because the wound bled into Tucker's lungs and abdominal cavity, Dr. Smith testified that Tucker also was "breathing blood" and "starving for oxygen." Tucker also had multiple internal injuries, according to Dr. Smith, that resulted from some weight being placed on his body. However, Dr. Smith opined that neither the weight of Anderson's body alone, nor the weight of

Anderson's body combined with the plywood and dirt would have produced the extensive internal injuries sustained by Tucker and that some additional weight or force had been applied to his body.

Dr. Smith testified that Delois Anderson also had sustained several injuries, including a scalp tear on the back of her head inflicted two to six hours before her death, an injury to her forehead consistent with her position in the grave, and injuries to her neck consistent with manual strangulation. None of these injuries would have caused death had she been afforded medical treatment. Dr. Smith testified that Delois Anderson died from asphyxia caused by the position of her head against her body, dirt in her mouth and nose, and trauma from weight on her body.

. . . Nakeita Shaw said that she still loves Montgomery very much, and she asked the jury to spare his life. Montgomery's aunt, Mattie Calhoun, also testified on his behalf. Calhoun said that Montgomery was an average student, that he had a very poor relationship with his father, that another man had helped to rear Montgomery when his father abandoned him at age five or six, and that this individual had died in 1986. Calhoun told the jury that the prosecution had the "wrong people" and begged the jury to spare Montgomery's life. Lastly, Montgomery testified on his own behalf about how he and his brothers and sisters were raised by his mother in Memphis and about how he last saw his father, who was still alive, when he was five years old. He testified that he had spent slightly over nine years in the penitentiary for previous convictions, that he had a job when he was released in January 1994, and that at the time of these crimes his ten-year-old son was living with him. Montgomery proclaimed his innocence and asked the jury to spare his life.

Carruthers presented the testimony of Bishop Richard L. Fiddler, who had been involved in prison ministry for twenty years and had visited Carruthers while he was incarcerated awaiting trial. Fiddler believed that Carruthers was honest and straightforward, was "a person of quality and worth," and was very upset about the victims' deaths. According to Fiddler, Carruthers viewed the trial as his opportunity to be vindicated. Fiddler asked the jury to spare Carruthers' life. Carruthers' sister, Tonya Yvette Miller, a counselor at the Shelby County adult offender center, testified that their mother raised four children on her own in one of the worst housing projects in Memphis and that, as the oldest son, Carruthers was the "man of the household." Miller admitted that her brother had fallen into bad company and had a hot temper but testified that he never planned to do anything wrong but acted out of "anguish and anger." She also stated that her brother had been raised to tell the truth. Miller told the jury that if she believed her brother had committed these crimes she would be the first person to say that he deserved the death penalty, but Miller said that Carruthers was innocent and that, therefore, he "does not deserve the death sentence." Testifying on his own behalf, Carruthers asserted that he was innocent of the crimes

and did not deserve to die. He said he would not have killed his friend because he "wasn't raised like that."

### Jury Findings

Based on this proof, the jury found the following aggravating circumstances as to each defendant on each of the three murder convictions: (1) "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;" (2) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" (3) "[t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy; or unlawful throwing, placing or discharging of a destructive device or bomb;" (4) "[t]he defendant committed mass murder, which is defined as the murder of three (3) or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan." Tenn. Code Ann. § 39-13-204(2), (5), (7), and (12) (Supp. 1994). Finding that these aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury imposed the death sentence as to each defendant for each of the three murder convictions.

Carruthers, 35 S.W.3d at 524-32 (footnotes omitted).

## FORFEITURE OF RIGHT TO COUNSEL

The present case is unique in that the petitioner, a capital defendant, was required to represent himself at trial. In its direct appeal opinion, our supreme court detailed the circumstances that led to the petitioner's self-representation. Because these circumstances are pertinent to an understanding of the petitioner's current claims of ineffective assistance of pretrial and appellate counsel, we again quote extensively from our supreme court's direct appeal opinion:

### Forfeiture of Counsel

We begin our analysis of this issue by summarizing the events that culminated in Carruthers being required to represent himself at trial. As previously stated, these crimes occurred on February 24 or 25, 1994. Carruthers' family initially retained AC Wharton, Jr., to represent him. Wharton was allowed to withdraw on March 19, 1994, because of a conflict of interest. On May 31, 1994, the trial court appointed Larry Nance to represent Carruthers. The State filed a notice of intent to seek the death penalty on July 8, 1994. At a hearing held on July 15, 1994, the trial court scheduled a pre-trial motions hearing for September 30, 1994 and set the case for trial on February 20, 1995. Carruthers was present at this hearing and asked the

trial court, "I'd like to know why this is being dragged out like this. I asked Mr. Nance if we can go forward with a motion of discovery and he's asking for a reset. And I'd like to know why." Nance informed the court that he was planning to visit the prosecutor's office later in the week to review the discoverable materials and evidence. The trial judge then advised Carruthers in pertinent part as follows:

> [G]iven the fact that the trial isn't until February, we're setting the next Court date in September for the arguing of motions. Between now and September, your attorney and the attorneys representing your two co-defendants can get with the prosecutors and can obtain their discovery. They're all excellent attorneys. And they'll all do that. And once they've obtained the discovery, they'll meet with their clients and they'll file appropriate motions, which will be heard on September 30th, which will still be well in advance of the trial date, which will give everyone ample time to then evaluate the case, after the motions have been heard and ruled on. So given the fact that we can't get a three-defendant capital case that's still in the arraignment stage to trial any earlier than February, there's plenty of time for your attorneys to meet with the prosecutors, get the discovery, meet with the clients, file motions, argue motions. Just because he hadn't done it yesterday, because you want him to have it done yesterday, doesn't mean that he's not working on your case diligently and properly. He'll have everything done well in advance of the next Court date. And so, you know, he may not do it the very moment you want it done, but you're going to have to work with him on that because there's ample time for him to get it done.

On August 12, 1994, the trial court appointed Craig Morton to assist Nance. When the pre-trial motions hearing convened on September 30, 1994, all defense attorneys involved in the case requested a continuance until November 14, 1994 so that additional pre-trial motions could be filed. The trial judge agreed to continue the hearing and also indicated that, where appropriate, a pre-trial motion filed on behalf of one defendant would be applied to all defendants without a specific request.

Because the trial judge had received "an abundance of correspondence from both Mr. Montgomery and Mr. Carruthers expressing concern about the pretrial investigation that has been conducted by their attorneys," the defendants were brought into open court and advised of the continuance. The trial judge then asked the attorneys to "state, for the record, the work that they've done and the work they intend to continue doing on behalf of their client." Each team of defense lawyers reported to the trial judge on the work that had been completed and on the work they intended to complete in the following days.

In particular, Nance indicated that he had inspected a majority of the physical evidence, filed six or seven motions, issued subpoenas for approximately eight witnesses, interviewed several of the one-hundred witnesses listed by the State, met with Carruthers in lock-up at the courtroom on two separate occasions, met with Carruthers' family, and spent approximately twenty-five hours on the case. Nance admitted that "some enmity" had developed between him and Carruthers, but indicated that he believed the problem could be resolved.

Carruthers also was allowed to voice his complaints about his attorneys on the record, and his primary complaint was that his attorneys had not met with him as often as he had expected. After hearing the comments of both Nance and Carruthers, the trial judge concluded as follows:

> in my opinion, what has been done thus far in this case, given the fact that there are still six more weeks before the next motion date, and then a full three months beyond that before the trial date, is appropriate and well within the standards of proper representation.

On October 21, 1994, the trial court approved payment for investigative services for Carruthers and authorized competency evaluations for both defendants. Morton informed the trial court that the investigator, Arthur Anderson, had attempted twice to meet with Carruthers at the Shelby County jail and that Carruthers had refused to meet with him on both occasions.

On November 14, 1994, Carruthers filed his first motion for substitution of counsel. Four days later, on November 18, Morton asked the trial court to appoint a different investigator who would take a more aggressive approach. The trial court agreed to appoint a new investigator and continued the hearing date on the pre-trial motions until December 16, 1994. On November 23, 1994, Morton advised the trial court that he had retained the services of Premier Investigation.

Although the record does not reflect that a hearing was held, the trial court allowed Nance to withdraw from representing Carruthers on December 9, 1994. According to statements made by the trial court at a later hearing, Nance was allowed to withdraw because of "personal physical threats" made by Carruthers that escalated to the point that Nance did not "feel comfortable or safe, personally safe, in continuing to represent Mr. Tony Carruthers."

Coleman Garrett was appointed to replace Nance and represent Carruthers along with Morton. The trial judge also authorized James Turner, a third attorney, to assist the defense as an investigator. Both counsel and Carruthers continued to file pre-trial motions. Some of these motions were heard on December 16, 1994, and another hearing was scheduled for January 30, 1995. On that date, Garrett and

Morton appeared and presented argument on over seventeen motions. At this hearing, the trial judge agreed to reschedule the trial from February of 1995 to September 5, 1995. At a hearing on May 1, 1995, Garrett and Morton presented argument on several more pre-trial motions including a motion to dismiss the indictments, a motion to sever, and a request for expert services to analyze an audio-tape of Nakeita Shaw's statement. On May 5, investigator/attorney James Turner was allowed to withdraw because he was a solo practitioner and could not maintain his practice and effectively perform the investigation needed on the case. However, the trial court appointed another attorney, Glenn Wright, to act as investigator. On June 2, 1995, Garrett again argued that the indictments should be dismissed due to Shaw's allegedly false testimony before the grand jury.

On June 23, 1995, Garrett, Morton, and Wright sought and were granted permission to withdraw by the trial court. The record reflects that Carruthers also filed a motion for substitution of counsel. At a hearing on July 27, 1995, the trial court appointed William Massey and Harry Sayle to represent Carruthers. During this hearing, the trial judge commented as follows:

> All right. I understand that these three defendants are on trial for their lives and that these are the most serious of charges and that they are all concerned that they are well represented and properly represented, and it's everyone's desire to see to it that they are well represented and properly represented. And toward that end, efforts are being made that they are represented by attorneys that have enough experience to handle this type of case and by attorneys that can establish a rapport with their clients that would allow them to represent their clients well.

> We have gone through several attorneys now in an effort to accommodate the defendants' requests in that regard, but at some point--and in my opinion, each of the attorneys and each of the investigators that has represented these defendants that has been relieved have been eminently qualified to do the job, but I have allowed them to be relieved for one reason or another.

> I want the record to be perfectly clear at this point because of some suggestions that have already been raised by some of the correspondence that I have received from Mr. Carruthers, and all of it, by the way, will be made a part of the record. *But Mr. Carruthers has suggested, in his correspondence, that some of the previous attorneys have been relieved because they weren't capable or competent to do the job. And that is, in my opinion, at least--my humble opinion as the judge in this case--absolutely and totally an*

*inaccurate statement. The attorneys that have been relieved thus far have been fully capable and fully competent and had been doing an outstanding job, but for a variety of reasons, I've allowed them to withdraw from the case.*

\* \* \* \* \* \*

Mr. Carruthers has raised, through his correspondence, and apparently through direct communication with his previous attorneys, certain matters that are pretty outrageous suggestions, but because of the nature of the matters that he's raised, the attorneys that represented him previously felt that an irreparable breach had occurred between their ability--between Mr. Carruthers and themselves--effecting their ability to continue to represent them. *And at some point--and that could well have been the point, but it wasn't. But at some point these matters that are raised by the defendants cannot continue to be used to get new counsel because it gets to be a point where they're--it's already well beyond that point, but, obviously, at some point, gets to the point where they're manipulating the system and getting what they want--Mr. Carruthers, sit still, please, or you can sit back there--gets to the point where they're manipulating the system and getting trial dates and representation that they want and are calling the shots.* That's another matter that's been raised by Mr. Carruthers in some of his correspondence, that he wants his attorneys to know that he's the man calling the shots in this case, and he's the man to look to.

Well, of course, again, it's a free country, and he can say whatever he wants, and he can think whatever he wants, but as far as I'm concerned--and this applies to all three defendants and any defendants that come through this court that are represented by counsel--and this gets back to what Mr. McLin alluded to earlier--the attorneys are calling the shots in this case. They are trying the case except for certain areas where the defendant has the exclusive and final say, such as areas of whether he wants to testify or not and that sort of thing. The attorneys are in here representing these clients and will do so to the best of their ability. They are the ones who have been to law school. They are the ones that have been through trial many times before, and they're the ones that are here for a reason, and that reason is to represent these individuals. And, so you know, if there's a conflict between the attorney and client with regard to how to proceed in the case, you all resolve it as best you can, but ultimately the attorney is trying the case. And, you know, we don't

pull people in off the sidewalk to try these cases, and the reason we don't is because of certain things that they need to learn and certain experiences they need to have professionally before they're prepared to try these cases. So they're here for that reason and for that purpose.

\* \* \* \* \* \*

So that gets me to the reason for our being here. *Because of the matters raised by Mr. Carruthers, I have granted the request of his previous two attorneys and investigator reluctantly because, in my opinion, they were doing an outstanding job of representing Mr. Carruthers and his interests.*

\* \* \* \* \* \*

Because of the most recent rash of allegations raised by Mr. Carruthers in his many letters that he's sent me--I assume he's sent copies of the letters to his counsel and to others, but I've certainly got them, and they will be made a part of the record. And because of the types of things he alleged in those letters and the position that it put his previous attorneys in, and their very, very strong feelings about not continuing to represent Mr. Carruthers under those circumstances, I have reluctantly agreed to let them withdraw.

And in an effort again to get attorneys who I'm satisfied have the experience and the willingness to handle a case of this seriousness, I have approached and am inclined to appoint Mr. Harry Sayle, who is out of town this week and couldn't be here today but who indicated he would be willing to take the case on, and Mr. Bill Massey, to represent Mr. Carruthers.

\* \* \* \* \* \*

*And as I have stated, I'm running out of patience with regard to these different issues--and I use that word advisedly--being raised by the clients with regard to any objections they have with regard to their attorneys. And as far as I'm concerned, these are the attorneys that will represent these men at trial. It's going to have to be one gigantic conflict--one gigantic and real proven, demonstrated conflict before any of these men will be relieved from representation in this case. There will be no more perceived conflicts, no more unfounded, wild allegations raised through correspondence, no more*

-16-

*dissatisfaction with how my attorney is handling my case for anybody to be relieved in this case.*

> *These are the attorneys, gentlemen. You either work with them or don't. It's up to you. But they're the men that are going to be representing you at trial.*

(Emphasis added.) Consistent with prior practice, the trial court approved an initial $1000 expenditure for investigative services for Carruthers' newly appointed defense team and conditioned further funding upon a specific showing of necessity by the investigator. Massey indicated that he preferred to use his own investigator rather than an attorney; therefore, Arthur Anderson, who previously had been employed on the case, was retained.

The trial court approved additional funding for investigative services on August 11, August 31, and again on September 27, 1995. Also, due to his recent appointment to the case, Massey requested and was afforded a trial continuance until January 8, 1996. Like previous counsel, Massey and Sayle filed many pre-trial motions on behalf of Carruthers. By November 17, 1995, Massey informed the trial court that all necessary and appropriate pre-trial motions had been filed.

However, about a month later, on December 19, 1995, Massey filed a motion requesting permission to withdraw as counsel. As grounds for the motion, Massey stated that his relationship with Carruthers had "deteriorated to such a serious degree that [counsel] can not provide effective assistance as required by state and federal law. . . . Counsel's professional judgment cannot be exercised solely for the benefit of Defendant, as counsel fears for his safety and those around him." Attached to the motion were several letters Carruthers had sent to Massey, both at his home and at his office in late November and early December of 1995. In the letters, Carruthers accused Massey of lying, and of being on drugs, threatened counsel, and expressed overall dissatisfaction with counsel's handling of the case. Massey made the following statements to the trial court at the hearing on his motion to withdraw:

> I would just say that in 15 years of practicing law, I have never ever made a motion of this nature. I have never–I've never found it difficult to advocate on behalf of a case. I wouldn't find it difficult to advocate on behalf of this case. *I do at this point, however, find it very difficult to advocate on behalf of Mr. Carruthers. And that is simply because he's made it that way.* If I were receiving letters that merely stated I was incompetent and that I wasn't handling his case right, and those type of letters--we all get those time to time--I don't mind those. Those don't bother me. *When I have letters that come to me that are threatening, when I have telephone calls that come to*

*my office that are threatening the safety of me and my staff and those around me, I have real problems with that. It's gotten so bad, your Honor, that my secretary is having nightmares. The last call Mr. Carruthers made is Exhibit E to this verified motion. She called me in absolute tears crying uncontrollably, hysterically crying over his antics.* That's the same way he's been doing me. I just haven't broken down and started crying about it. But I do have very, very strong, such strong personal reservations as I have never experienced before as an advocate. Your honor, in advocating cases, particularly capital cases, I find the first thing I have to do to be persuasive is to believe. I have to believe and I have to feel. Because if I don't believe and I don't feel and I'm not sincere, I cannot impart that to a jury. They see my insincerity. They see just words, a parrott-like proficiency as opposed to feeling. They don't act on that. They shut that out. That's been my experience. And I don't believe that that feeling, I know that I can't advocate. I've lost my will to advocate on this case. I don't have any doubt about that at this point. I don't have any doubt. I'll tell you as an officer of this court. I don't have any doubt that would be a major problem. *And despite Mr. Carruthers threats and antics, I care for the integrity of the system. I care that his rights are protected even when he tries to destroy them himself and impair them. And I don't know what the Court's answer is. I know that the Court is in a very difficult position here. Obviously, it's very clear what the ploy is. It's very clear that we're never going to get to trial like this.* And if we do, then there's going to be a record made for ineffective assistance of counsel. And they believe, Mr. Carruthers believes, that doing all of these things is going to make him a record as opposed to doing things from a legal standpoint in the courtroom. There are motions, objections at trial and through the proper avenues that the courts of appeals will recognize as a legal basis for a reversal. *But we've gotten outside the legal area in this case and we've gone into the area of intimidation, threats.*

(Emphasis added.) Despite Massey's argument, the trial judge denied Massey's motion, stating as follows:

> With regard to Mr. Massey's concerns, I certainly believe that everything Mr. Massey has stated in his motion is factually accurate and correct. I don't have any reason to doubt that his secretary received the phone call that she says she received in the memo she prepared, or that any of these other things transpired. *But I do think and I do agree with Mr. Massey's characterization that these efforts by Mr. Carruthers are a part of an overall ploy on his part to delay*

-18-

*the case forever until something happens that prevents it from being tried.*

\* \* \* \* \* \*

In my opinion, to try to make the record reflect as clearly and accurately as possible the fact that the system is doing everything it can to make sure that Mr. Carruthers is properly and thoroughly represented in this case. And Mr. Carruthers may step out to the back. *He just was pointing to Mr. Massey with some sort of threatening gesture.* And he's going to sit in the back for the remainder of this hearing. Put him in the back room and keep him back there. Lock the door. Mr. Montgomery, you will join him in a minute if you choose to conduct yourself in that manner as well. *The system has done all it can, in my opinion, to make sure that Mr. Tony Carruthers is well represented.* And I've tried to be as patient as I can be in listening to the concerns of defense counsel and investigators in making sure that no conflict existed in the representation of either of these men. The specific reasons, the narrow specific reasons for the excusal of the previous attorneys and investigators differ a little bit from those complaints that Mr. Massey has raised today. And so when Mr. Massey says '[t]hat just because I'm the 4th or 5th attorney in line doesn't mean that I now have to be stuck, in effect, in representing him just because others have been relieved and the Court is anxious to get the case tried. My complaints are as valid as theirs were. And if they were relieved, then I should be relieved as well.' And I understand that position. But first of all I'll respond to that by saying their complaints were a little bit different, and I'm not going to go through them on the record now. The record is clear in those instances. One envelope is sealed with several letters that will reveal what those complaints were and the complaints from attorneys prior to that were a little bit different in nature. Not to minimize the seriousness of Mr. Massey's complaints, but those complaints were a little bit different. And so it[']s not that he just happens to be the 5th attorney in line, and he's the one that is going to quote, get stuck, representing Mr. Carruthers. Their complaints were a little bit different. And factually there are some distinctions that can be drawn between the complaints that they had and the complaints that you've voiced.

(Emphasis added.) The trial court also emphasized that Carruthers' ploy had become more apparent over the course of the proceedings.

-19-

With the very first set of attorneys I tried to give Mr. Carruthers the benefit of the doubt and excused them for reasons similar to yours, but a little bit different. With the second set of attorneys I tried to give Mr. Carruthers the benefit of the doubt and excuse them for reasons similar to yours, but a little bit different. Now that we're in the third set of attorneys, the ploy is much more apparent than it was with the first set of attorneys. Although, it was somewhat apparent to any of us who have been in these courts for many, many years as we all have been. Not wanting to jump to any conclusions or not give him the benefit of the doubt, the first and second sets of attorneys were excused. *But now that we're into the third set of attorneys the ploy is much more apparent and, therefore, I'm much less receptive to these sorts of arguments than I was a year ago when the first set of attorneys came in wanting to be relieved.*

(Emphasis added.)

Finally, in response to counsel's comment that Carruthers should just go "pro se," the trial court concluded that it should refuse "to force a man to go pro se in a capital case if he doesn't want" and observed that Carruthers had never asserted his right of self-representation. Although Massey's motion to withdraw was denied, the trial judge granted his request for additional funds for further investigation and for hiring a mitigation specialist.

On January 2, 1996, six days before the trial was scheduled to begin, Massey renewed his motion to withdraw. Massey informed the trial court that he had continued to receive threatening letters at his home and was concerned for his daughter's safety because Carruthers had described the car she drove. Massey indicated that he cared more about Carruthers' right to a fair trial than did Carruthers himself, but given the recent and ongoing threats, Massey declared, "I don't want to represent this man. I can't represent him. I won't represent him."

At this hearing, the prosecution took the position that Massey should not be allowed to withdraw because the defendant was simply manipulating the system in an attempt to delay his trial. The State pointed out that the case had been pending for almost two years and each time a trial date drew near Carruthers would increase his letters and efforts to alienate his attorneys either through written or verbal personal attacks or threats. The State urged the trial court to deny the motion to withdraw and proceed to trial:

> [I]f a defendant, Your Honor, can threaten the system, if he can manipulate the system by threats, by letters, I'm not sure if that's what the makers of the constitution meant when they sat in

-20-

Philadelphia and they said, look, let's let every defendant have a fair trial. Let's let him have a lawyer. Let's let a jury be over here. Let's let him have a judge; that's fair. Let's let no man be accused of a crime, will not go to trial, unless he receives a fair trial. Let no man be convicted--but the framers of the constitution, Your Honor, had not met Tony Carruthers.

After considering the comments of counsel, the trial judge briefly recounted the history of the case and again emphasized that, in his opinion, all of the attorneys appointed for the defendant, including Massey and Sayle, were excellent trial lawyers who had fully performed their duties with regard to Carruthers' defense, including filing all relevant motions and thoroughly pursing the investigation of the case. The trial court then ruled on Massey's motion to withdraw, stating as follows:

Now, this is the way that the case is going to proceed on Monday. Mr. Massey is still on the case. He still represents Mr. Carruthers. If between now and Monday Mr. Carruthers chooses to discuss with Mr. Massey the case and to cooperate with Mr. Massey in his preparation of the defense in this case, then I'll look to Mr. Massey to go forward in representing Mr. Carruthers. There have been disputes and conflicts between attorney and client before. This is not the first time that there has been a problem between attorney and client, and these types of problems can be repaired oftentimes. And differences can be patched up, and attorneys can go forward. And I would hope that that would be the case in this case. And I would hope that Mr. Carruthers would between now and Monday, work with Mr. Massey and Mr. Sayle in preparation for a trial. *If Mr. Carruthers elects not to, however, he will go forward representing himself.* This was raised on the 19th when Mr. Massey filed his motion to withdraw and we first heard it. At that time, I rejected the idea. I was reluctant to because I've never required an individual to go forward representing himself when he has not requested that. And I don't like that idea, but I've given a lot of thought to that suggestion since the 19th. For the record, Mr. Massey called me shortly after our hearing on the 19th when he received some letters in the mail from Mr. Carruthers that dealt further--that he felt further undermined his ability to represent him. And I just want that on the record so there is no misunderstanding about that. But since the 19th, and after the phone call from Mr. Massey that I received, after the hearing on the 19th, and after his request today, I've given it a lot of thought to what options were left, what options are still available in this case. *And in my judgment, the only option that is still available if Mr. Carruthers chooses not to work with Mr. Massey and Mr. Sayle in going forward*

*with this case next Monday, is for him to represent himself. And I'll provide him with a copy of the rules of Tennessee procedure, the rules of evidence. And he can sit at counsel table and voir dire the jury, and question witnesses, and give an opening statement, as any lawyer would, and he would be required to comply with all the rules as any lawyer would, if he chooses to go forward on his own. If he chooses to say nothing, then that's his prerogative, and--But that's what the situation will be next Monday, Mr. Carruthers. And the choice is yours. Again, the choice is yours.* You have for the third time around an outstanding attorney representing you. And he's here, and he'll be available. If you choose to avail yourself of his services, he will represent you on Monday. If you choose not to, you can go forward representing yourself. If you go forward representing yourself, I will require Mr. Massey and Mr. Sayle to be available as elbow counsel so that at any recess or overnight, you can seek advice from them, and they can confer with you and advise you in any way that they deem appropriate. So if you elect not to have him represent you and you go forward representing yourself, they'll be in the courtroom observing, and they'll be available to offer advice and counsel to you at any recess, lunch break, overnight break. One of those two scenarios will occur next Monday. *And again, it's up to Mr. Carruthers because we've been through this now for many, many months and at this point in time, the case needs to go forward.* There is no other reason for the case to be reset, no proof problems from one side or the other, no witness problems from one side or the other. The case is now set for the third time for trial. There is no extrinsic reason for an additional continuance. *And--so Mr. Carruthers is going to have to decide in which manner he wishes to proceed on Monday, but the case will go forward on Monday.* And I'll hear back from Mr. Massey Monday morning with regard to whether he has been able to confer with his client and what the progress of that has been, and whether he feels that the progress has been such that it would allow him to go forward in representing Mr. Carruthers.

(Emphasis added.)

The record reflects that at a hearing held the next day, January 3, 1996, Carruthers was "glaring" at Massey while "gritting his jaw." Upon observing Carruthers' conduct, the trial court once again cautioned the defendant as follows:

*And again, as I did yesterday, I want to remind Mr. Carruthers that if it is his decision not to proceed with Mr. Massey and to proceed pro se--just a minute. I'll let you speak in a moment--then he needs*

*to understand that he will be held to the same standard that attorneys are held to during a trial. Rules of evidence, rules of procedure will apply. And he will need to familiarize himself as best he can with those procedures and those rules between now and trial date because in proceeding pro se, he will certainly be held to that same standard.* Obviously, he realizes the charges that are pending and the potential for the imposition of the death penalty involved in this case. We've had numerous hearings and motions over the past fifteen or eighteen months, and all of those matters should be very apparent to Mr. Carruthers at this point in time.

Responding to the trial court's admonition, Carruthers said he did not want Massey representing him because Massey was on cocaine.

Following this hearing, Massey filed an application for extraordinary appeal in the Court of Criminal Appeals challenging the trial court's ruling that he remain on the case either as counsel or as advisory counsel. In an order dated January 8, 1996, the Court of Criminal Appeals held that Massey should be allowed to immediately withdraw from further representation, stating:

> This Court is of the opinion that the attorney-client relationship which may have previously existed, has deteriorated until such a relationship does not exist between Carruthers and Mr. Massey. Also the circumstances of this case make it impossible for Mr. Massey to ethically represent Mr. Carruthers. Carruthers has proclaimed that he will do bodily harm to Massey. He has in essence and in fact threatened Massey with death. Carruthers, who has a history of violent conduct, is apparently a member of a gang. All of his correspondence to Massey carries a drawing of a lidless eye that watches from the top of a pyramid. Moreover, Massey's family is filled with fear and anxiety due to the threats made to Massey; and Massey's secretary, who has had dealings with Carruthers by telephone, likewise has fear and anxiety based upon her conversations with Carruthers and the threats made against Massey. Given these circumstances, Mr. Massey had no alternative but to seek permission to withdraw as counsel. He is supported in this endeavor by the Disciplinary Counsel for the Tennessee Supreme Court Office, which advised Massey that he was ethically required to withdraw as counsel, and, if the motion was denied he was required to seek relief in the appellate courts.

\* \* \* \* \* \*

-23-

Given these facts and circumstances as well as the relevant provisions of the Code of Professional Conduct, which governs the conduct of lawyers in the State of Tennessee, Mr. Massey was entitled to be relieved as counsel of record for Mr. Carruthers. *If there ever was an amicable attorney-client relationship, it was eradicated by Mr. Carruthers' conduct in writing the letters aforementioned and threatening to do bodily harm to Mr. Massey the first time he saw him*. Today, Mr. Massey and Mr. Carruthers are at odds and their differences are irreconcilable. Furthermore, Mr. Massey, who emphatically denied any misconduct or addiction to drugs, must attempt to protect his family, secretary, and himself from physical harm as well as protect himself from further disciplinary complaints.

(Emphasis added.)

The same day this order was filed, but before the trial judge had received the order, a hearing was held in the trial court. After learning that Massey had received seven more pieces of certified mail at his home since the hearing on January 2, and after being advised by Massey that the difficulties with Carruthers had not improved, the trial judge concluded that Carruthers,

through his actions, through his accusations, and letters, he has forced himself into a situation where I have no option but to require that he proceed pro se. And so in deference to your request, I will go forward with my previous statement and that is that you and Mr. Sayle will remain as elbow counsel. Mr. Carruthers will represent himself.

The trial court then reiterated, "[f]rom this point forward I'll give Mr. Carruthers the opportunity to speak on his own behalf at appropriate times. As I indicated to him last week, he will be expected to comply with all of the rules of procedure and evidence that an attorney would be required to comply with."

Upon hearing the trial court's ruling, Carruthers claimed that he had attempted to reconcile with Massey and complained that he was not qualified to represent himself. The trial judge responded:

Well, those are the perils in going forward pro se. And in my judgment, Mr. Carruthers, as I've said on several occasions, and I don't intend to get back into a lengthy hearing on this issue at this time, but we've had two or three hearings already on this. In my judgment, and I understand you're stating now that you don't feel capable of going forward and representing yourself. *But you need to*

*understand that in my judgment you have created this problem for yourself. You are the author of your own predicament by, in my opinion, sabotaging the representation of you by four previous attorneys. These are now your fifth and sixth attorneys. In my judgment, because of actions that you've taken over the past 18 months, because of actions that you've taken, you are now in this situation. And so it may well be difficult for you to go forward in representing yourself, but this is the situation that you've created and you're going to have to do the best you can, because there is virtually no option left at this point. To reset it again, history would should would only--would be a futile effort, because at the eleventh hour with the seventh and eighth attorneys representing you, there would be some other effort, in my opinion, some other manipulation on your part that would then cause those attorneys to come in and want to get off your case. And then we'd reset it and appoint the ninth and tenth attorneys, and the eleventh and twelfth. And there'd be no end to it.*

\* \* \* \* \* \*

And so we're going forward and you're going to represent yourself. I understand you may not have experienced or gone through a voir dire process before. And that's unfortunate. I wish you had cooperated and gotten along with Mr. Nance a year and a half ago. He was an excellent attorney, has tried many, many cases in these courts, serious difficult cases and done an excellent job. I wish you had cooperated and gotten along with Coleman Garrett who, in my opinion, is one of the best trial attorneys in this entire state. He's tried many cases in this courtroom and defended individuals remarkably well. I wish you had cooperated and gotten along with Mr. Craig Morton and Mr. Glenn Wright, and Mr. Harry Sayle, and Mr. William Massey, because I think it would've been in your best interest to have done so. But it's been obvious that you have not. And so for that reason we're going forward.

\* \* \* \* \* \*

*It's not easy to make this decision. It's not a decision that I made lightly or take lightly. But I tell you what, if the record isn't complete enough and replete enough with evidence of manipulative conduct and obstructionism, then I can't imagine ever there being a record for the appellate courts in Tennessee that would meet that criteria.*

(Emphasis added.)

After the trial court ruled, Carruthers offered to waive any conflict, to allow Massey to continue representing him, to apologize to Massey, and to testify that the accusations he had made against Massey were untrue. The trial court refused, finding that Carruthers was merely using another tactic to delay the proceeding.

The next day, January 9, 1996, the Court of Criminal Appeals entered an addendum to its previous order and allowed Massey to be completely relieved from further representation or participation in the case including providing assistance as "elbow counsel." However, Sayle continued on the case as elbow or standby counsel.

During voir dire two days later, January 11, 1996, the State requested a continuance of the trial due to the hospitalization of one of its material witnesses, Nakeita Shaw. The trial court granted the State's motion for a continuance and rescheduled the trial for April 15, 1996. At this point, in light of the continuance, Carruthers made an oral motion for appointment of new counsel. The trial court denied the motion, stating:

> The ruling still stands. The system will not be held hostage by Tony Carruthers, and to go through another round of attorneys will be doing just that, because history suggests, as you've done in the past, that is if new attorneys were appointed and spent the time and investigated, the effort to get ready on this case, then at the eleventh hour something would happen, some allegations would be made that would undermine their ability to represent you, they'd ask to withdraw, we'd be back in the same situation that we were in with Mr. Larry Nance, with Mr. Coleman Garrett, with Mr. Bill Massey, all three of whom are outstanding criminal defense attorneys. All three of whom were fully capable of representing you, and all three of whom had to be relieved because of your actions. And in my judgment, enough is enough. And because of your actions, these attorneys are no longer representing you and, therefore, you will be representing yourself. You have ample time to prepare. You have access to legal opinion from Mr. Sayle. You have the file. You have the rules. You have a jury consultant. You have an investigator. And this is the manner in which we're going forward.

On January 16, 1996, the trial court approved Carruthers' request for funds to obtain an investigator to assist him and authorized the investigator to contact the trial court directly if additional funds were needed. In February of 1996, Carruthers filed two more written motions for appointment of counsel which were again denied by the trial court for the same reasons set out above. In a hearing on February 20, 1996, the trial court considered Carruthers' pre-trial requests for funding for expert

services, and, at this hearing, again recounted the events that culminated in Carruthers being required to represent himself. The trial court observed that "it will be apparent to anyone who objectively views this situation that Carruthers is not being denied the right to counsel."

Throughout these pre-trial proceedings, the trial court treated Carruthers with respect, patiently listened to his arguments and requests, and afforded Carruthers and his investigator considerable latitude in scheduling and arguing motions, even though most of these motions were similar or identical to motions that had already been filed and argued by counsel who had previously represented Carruthers. When Carruthers requested *ex parte* hearings to seek funding for experts, the prosecution would voluntarily leave the court room. The trial judge granted Carruthers' request for funding to obtain a forensic pathologist, but denied his request for funding for an accident reconstructionist.

In February of 1996, the trial court allowed Sayle to withdraw as elbow counsel because Carruthers apparently had no confidence or trust in Sayle and because Carruthers was launching personal, verbal attacks upon Sayle. When Sayle moved for permission to withdraw as elbow counsel, he stated:

> He has expressed the feeling that I am not working for him and that I have not done anything for him, I'm not going to do anything for him. He suspects--he's made it clear that he suspects that I'm working with the state in some capacity. And frankly none of the advice I give him is followed, and I don't think there is any intention of following it. And frankly its just--and the abuse gets extremely personal. Personal villification over the last couple of meetings, and I see no basis for being able to continue.

Thereafter, Carruthers twice made oral motions for appointment of counsel, first on March 4, 1996, and then on April 15, 1996, the day jury selection began. Again, the trial court denied these motions and noted that this was not the first case in which Carruthers had employed such tactics. Carruthers therefore represented himself at trial and sentencing, participating in voir dire, presenting opening statement, questioning witnesses on cross-examination, making objections, presenting witnesses in his defense, and presenting closing argument. After the jury returned its verdicts as to guilt and sentencing, the trial court appointed counsel to represent Carruthers on his motion for new trial and on appeal.

Carruthers, 35 S.W.3d at 533-45 (footnotes omitted).

On direct appeal, the petitioner argued that he was denied his right to due process when he was required to represent himself during the trial of his capital case. In rejecting his claims, our

supreme court concluded that "an indigent criminal defendant may implicitly waive or forfeit the right to counsel by utilizing that right to manipulate, delay, or disrupt trial proceedings." Id. at 549. The court then found that the record in the case supported a finding of both implicit waiver, based on the trial court's repeated warnings to the petitioner that he would lose his right to counsel if he persisted in his misbehavior, and of forfeiture, based on the petitioner's "extreme and egregious" conduct. Id. at 549-50.

The court further concluded that the petitioner's implicit waiver or forfeiture of his right to counsel included a waiver or forfeiture of his right to effective assistance of counsel based on his own self-representation:

> To the extent that [the petitioner] is alleging his pro se representation was ineffective, we agree with the Court of Criminal Appeals' conclusion that when a defendant forfeits or waives the right to counsel, regardless of whether the waiver is explicit or implicit, he or she also forfeits or waives the right to effective assistance of counsel.

Id. at 551 (citations omitted). Despite having found "no evidence indicating that any one of the many attorneys appointed to represent [the petitioner] was ineffective," id. at 550, the court nonetheless noted in a footnote that the petitioner retained the right to raise an ineffective assistance of counsel claim with respect to any stage of the proceedings at which he had been represented by counsel:

> We note, however, that a defendant retains the right to complain of ineffective assistance with respect to any stage of the proceeding wherein he or she was represented by counsel. Cf. Daughtry v. State, 225 Ga. App. 45, 482 S.E.2d 532, 533 (1997) (stating that a criminal defendant will not be heard to assert a claim of ineffective assistance of counsel with respect to any of the stages of the proceedings wherein he was counsel). Therefore, as previously stated, our holding in this appeal does not preclude the petitioner from alleging in a post conviction petition ineffective assistance of counsel with respect to a stage of the proceeding wherein he was represented by counsel.

Id. at 551 n.31.

## POST-CONVICTION EVIDENTIARY HEARING

In his post-conviction petition, the petitioner alleged that pretrial counsel were ineffective for failing to conduct any meaningful investigation or preparation for trial, that appellate counsel were ineffective for failing to raise meritorious issues on appeal, and that the prosecution engaged in various acts of prejudicial misconduct. The petitioner's first witness at the evidentiary hearing was Dr. Cleveland Blake, who was accepted by the post-conviction court as an expert witness in the areas of forensic pathology, clinical pathology, and anatomical pathology. Dr. Blake testified that

he had performed over 6000 autopsies during the course of his career and had testified in a "[q]uite a few" criminal proceedings, primarily as a witness for the prosecution. He said he had been commissioned by the former director of the Tennessee Bureau of Investigation ("TBI") to teach death scene investigation to field agents and had worked in that capacity for approximately twenty-two years until his affiliation with the TBI ended in 1999 or 2000.

Dr. Blake testified that in February 1996, the trial court asked him to review some records in the petitioner's case, including the autopsy reports, and write an opinion based on his review. At the request of post-conviction counsel, Dr. Blake read aloud from a portion of the three-page opinion, dated April 1, 1996, which he had tendered to the trial court:

> In summary it would appear that the two black males were killed somewhat before the female who disappeared later. All three of the victims having their lives snuffed out well before adequate time to place them and conceal their bodies in the bottom of the already prepared burial site before Daniel's casket and vault were placed in the ground some time on February the 25th.

Dr. Blake also read aloud from the trial court's April 2, 1996, response letter to him:

> I received your report dated April 1, '96. I assume that Mr. Carruthers will contact you if he plans on having you testify at the trial. I have indicated to Mr. Carruthers that he's welcome to communicate directly with you and you with him without the necessity of going through me. If you have any questions, please feel free to contact me.

Dr. Blake testified that he was uncertain, after receiving this letter, as to how he could communicate with the petitioner, who was in jail in Memphis at the time. He said that he never spoke with the petitioner and was later notified by the trial court that the petitioner would not be calling him to testify as an expert witness at trial.

Dr. Blake testified that the first time he heard any suggestion that any of the victims had been buried alive was when he read Dr. O.C. Smith's trial testimony; Dr. Smith never mentioned that possibility in his conversations with him or in the autopsy reports. Dr. Blake stated that it was possible that Delois Anderson had been buried alive but that she already had some previously inflicted wounds, "including a neck strangulation." Had he been called to testify at trial, he would have disagreed with Dr. Smith's conclusions that the two male victims had been buried alive. Furthermore, "because of the ligature issue," he would have disagreed that Delois Anderson was conscious at the time she was buried. When questioned by the post-conviction court about the discrepancy between his present testimony and the conclusions he had reached in his April 1, 1996, letter to the trial court, Dr. Blake explained that he had changed his opinion after learning details, such as the description of the grave and the placement of the bodies in the grave, which were not available to him at the time he rendered his April 1, 1996, opinion:

[DR. BLAKE]: I didn't have at that time, Your Honor, the details of the testimony and description of the grave and her condition and the details about the restraint around her neck that apparently cut off her windpipe. She could have been conscious at the time. I can't prove that one way or the other, but she could have been conscious.

. . . .

THE COURT: So if you were asked the question to a reasonable degree of medical certainty, was she alive or dead when she was placed down there?

[DR. BLAKE]: She was unconscious and suffocated, and her head was placed down in the corner of this pit at the bottom of the pit and against the wall of the pit and some dirt was described as having been in her nose and mouth, but it was not aspirated or swallowed into her stomach.

THE COURT: Which she would -- your opinion is she would have been unconscious?

[DR. BLAKE]: She would have been unconscious.

THE COURT: Would she have felt any pain?

[DR. BLAKE]: Probably not.

Dr. George Nichols, accepted by the post-conviction court as an expert witness in the areas of anatomical, clinical, and forensic pathology, testified that, in the fall of 2002, Charles Ray, a Nashville attorney, asked him to perform an independent cause of death determination. He said that Ray gave him a number of different materials, including a videotape of the Rose Hill Cemetery crime scene, photographs, autopsy reports, the report of investigation of the county medical examiner's office, transcripts of the trial testimonies of Dr. O.C. Smith and Dr. Hugh Berryman, and various notes and newspaper clippings. After reviewing these materials, he responded as follows in a letter to Ray dated November 12, 2002:

Marcellos Anderson died as a result of a gunshot wound. Specifically there [were] multiple gunshot wounds. One in the back which produced no significant injury. One, a contact wound in the forehead that resulted in a small amount of intracranial hemorrhage in the subarachnoid space, but the bullet did not actually enter into the cranial cavity. Rather, it was restricted into the frontal sinus. What killed him is a gunshot wound which enters the right upper chest traverses into the spinal cord where it results in a laceration of the spinal cord at the level C-7. Associated with this are lacerations of the cervical spine and bleeding in the

-30-

membranes that surrender [sic] the spine and the brain. The subdural and subarachnoid spaces. That's the cause of death. . . .

. . . .

Next Fred[e]rick Tucker. Mr. Tucker died as a result of a gunshot wound to the chest resulting in a massive internal hemorrhage and at the chest called the hemothorax. He has evidence of other injuries, but the cause of death was clearly a gunshot wound. And last Delo[is] Anderson. She died as a result of compressive asphyxia. The compression at this point being around her neck. Resulting in obstruction of blood flow out of the head, causing petechiae hemorrhages or small red spots to occur as a result of capillary rupture with at least in the whites and pinks of her eyes. So she died an asphyxia death. There's clear evidence of shooting firearms injury being fatal in the two males.

Dr. Nichols testified that there was no evidence, in his opinion, "that any person was alive in the site in which their bodies were discovered." He further testified that there was "no proof of the best evidence of conscious activity of any victim while alive in the grave site." Specifically, he found no evidence of inhalation of dirt, mud, dust, or earth in the upper airways, mouth, or lungs of any of the victims, which would have indicated that the victims had breathed after being placed in the grave. On redirect examination, he reiterated that he found no evidence to show that "any of these three people were alive and breathing in that space. None."

A member of the petitioner's anonymous jury, who was identified at trial by the number 121, testified that he was living at 2031 Pamela Drive in the Frayser community of Shelby County at the time he served on the petitioner's jury. He recalled that someone had run over his mailbox during the summer of 1992 but did not recall having reported the incident to the police or making a complaint to the police about a neighborhood party. He testified that he later learned that an elderly man from his church, who could not drive very well, had accidentally run into his mailbox. He said he did not remember recognizing any of the courtroom spectators as one of his neighbors and, although someone had mentioned that the petitioner's mother was present in the courtroom, he was never sure "which one she was."

Juror 121 testified that the jurors who served at the petitioner's trial were kept anonymous but were not told why. He said he had assumed that it was standard procedure for a criminal trial. He described the atmosphere during the trial as "pretty intense," explaining that "they had [S.W.A.T.] team up there where we were sequestered." He stated that the jurors were sequestered on the second floor of the court building and left only one time for one or two hours when they were taken to the civil courthouse on Adams Avenue. On cross-examination, he testified that the heightened security during the trial did not affect his decision-making.

Jane Carruthers, the petitioner's mother, testified that in 1990 she purchased a home at 2013 Pamela Drive in the Frayser community, located two doors from the residence of Juror 121, where

she lived until 1997. She stated that she was one of the first African-Americans to move into the predominantly white neighborhood and, as a result, felt intimidated. She was "nice and cordial to [her] neighbors but . . . kept to [her]self." She testified that Juror 121 was unfriendly and would not answer her when she greeted him. In addition, he once accused her son, Terrance, of knocking over his mailbox. Ms. Carruthers also recalled that when she was hosting a welcome home party on the street to celebrate the petitioner's release from prison, someone in the neighborhood complained to the police.

Ms. Carruthers testified that she was not permitted to attend the jury selection process but was present every day of the petitioner's April 1996 trial. She said she recognized Juror 121 on the first day of trial and relayed the information to Patsy Weber, the jury specialist appointed to assist the petitioner, who told her that she would pass the information along to the judge. Ms. Carruthers testified that the trial judge mentioned the fact that Juror 121 was her neighbor at some point during the trial. However, she could not recall any of the particulars.

Terrance Roger Carruthers, the petitioner's brother, testified that he lived with his mother at 2013 Pamela Drive from 1990 until 1993 and first became familiar with Juror 121 when that juror called the police and accused him of running over his mailbox. He said that when the petitioner was released from prison in August 1993, his mother held a neighborhood fish fry that was attended by almost every resident on their street with the exception of Juror 121. During that event, someone called and complained to the police that the party was disturbing the peace. Because Juror 121 came out of his house when the police arrived, the witness believed that he was the person who had lodged the complaint.

Larry Nance, a Memphis attorney, testified that he was appointed to represent the petitioner on May 31, 1994. At the time of his appointment, Nance had tried one capital case as lead counsel. Nance stated that A C Wharton had represented the petitioner at the preliminary hearing. The court later appointed Craig Morton to assist Nance. Nance confirmed that, prior to Morton's appointment, he had spent approximately 60.15 hours on the case and, after Morton's appointment, 18.9 hours.

Nance recalled that the names of more than 100 witnesses were provided by the State in discovery. Nance located some of the witnesses and then talked to Ron Lax, an investigator with Truth Incorporated, but could not recall conducting witness interviews. Nance said that the petitioner provided him with the names of potential alibi witnesses, but he could not recall making contact with them. Although Nance had the autopsy reports of Dr. O.C. Smith, he did not make an application with the court to hire a forensic pathologist or a ballistics expert and did not consult with a DNA expert. Nance acknowledged that in the six-month period that he represented the petitioner he did not make plans for a social investigator.

Nance estimated that he met with the petitioner "a dozen" times at the jail. He elaborated that on at least two occasions the petitioner refused to meet with him during jail visits. As a result, "communication between the two of [them] broke down fairly early in the representation." On November 14, 1994, the petitioner filed a motion for substitution of counsel. Nance recalled

attending a bench conference where he was told he was being relieved but did not recall the petitioner being present at the conference. He was relieved in December. Nance recalled a hearing in October 1994 where the petitioner complained to the court about his representation. Upon the court's relieving Nance, Coleman Garrett was appointed as lead counsel. Nance said that Garrett did not ask for his file on the petitioner's case.

Steven Leffler testified that, in May 1996, he and Lee Filderman were appointed to represent the petitioner on his motion for new trial and direct appeal. At the time of his appointment, Leffler had been in practice for twelve years. Leffler said that his practice was "50/50" civil and criminal, with approximately 40% of his appellate experience being criminal. He acknowledged that he had not argued a case before the Tennessee Supreme Court prior to his appointment but said he had worked on other capital cases at the appellate level. Leffler stated that he and Filderman "split up the work" involving the petitioner's appeal. Both went through all of the trial transcripts, determined the scope of the appellate issues, and then decided which issues each would brief.

Leffler said that the amended motion for a new trial filed in September 1997 mentioned the inability of the petitioner to meet with Dr. Blake to determine whether to call him as a witness. Although this was raised in the amended motion for a new trial, neither Leffler nor Filderman visited with Dr. Blake or tried to interview him by other means. Also, no argument was made on this issue in the direct appeal. Leffler conceded that the issue as to whether the three victims were buried alive was emphasized by the State at the penalty phase. He acknowledged that there was no strategic reason for not developing evidence to attack Dr. O.C. Smith's testimony. Leffler agreed that, at the time, "the record was frozen" on the issue.

Leffler acknowledged that the petitioner's case was the first he was aware of where the judge impaneled an anonymous jury. He stated that he thought they had raised this issue in the motion for a new trial, but, if not, the issue was not omitted for strategic reasons. Leffler conceded that he did not think that the jurors' signing the death penalty verdict form by numbers, instead of names, was an issue. He explained that he understood that the trial court's motivation for the anonymous jury was fear of retaliation. Leffler's understanding was that the court could not impanel an anonymous jury throughout the trial and then require the jurors to reveal their identity by signing the verdict. He disagreed with the suggestion that the jurors were relieved of their sense of responsibility for imposing the death penalty in this case. Leffler acknowledged that there was no strategic reason not to pursue the issue as to whether Juror 121 knew the petitioner's family. Again, he stated that the "record was frozen," meaning, apparently, that he would not be permitted to develop a new factual record in support of these issues.

Regarding the petitioner's self-representation at trial, Leffler characterized it as "not competent." His opinion was that a capital defendant should not be permitted to represent himself. Leffler said that any challenge to counsel's omissions that possibly led to the petitioner's self-representation was usually raised in a post-conviction petition.

Leffler testified that he met with the petitioner at least three times and Filderman met with him at least once to discuss the appeal. Leffler provided the petitioner with drafts of the initial brief and asked for comments. Leffler could not recall discussing with the petitioner any issue with Juror 121. He also stated that the petitioner had personally approved the brief submitted to the Court of Criminal Appeals and that the only issue not included in the brief was an issue regarding the indictment. Leffler said that they were "very careful" regarding the issues included on direct appeal. Leffler said that he had a "fairly good working relationship" with the petitioner. He also stated that the petitioner "complained about a lot of things," including appellate counsel's lack of experience.

Lee Filderman testified that, prior to his appointment as second chair appellate counsel, he was familiar with the petitioner's case due to the media attention and from hearing discussions at the courthouse. At the time of his appointment, Filderman had been in practice for about three years but had no capital murder trial experience. He said he expressed his concern as to his inexperience in appellate work to the trial court.

Filderman testified that he did not contact Dr. Blake or attempt to get a copy of his file. Filderman described his involvement in this matter as follows:

> The way this worked during my entire representation of [the petitioner] was I initially met with [the petitioner] when he was at Riverbend Maximum Security Prison. I sat with him for three or four hours in lockup listening to pretty much everything he wanted to tell me and kind of sharing and trying to learn what had happened in the case. I reported back to Mr. Leffler at that point. He began his work and we met many times and reviewed the various aspects of the case and the appeal and what issues were pertinent and what weren't and what were appropriate for the appeal and what weren't. I was a sounding board to Mr. Leffler and certainly provided counsel in the matter, but he really ran the ship. He was the captain of the ship. And I was in no position to challenge that. . . . I did not take an active role in making the final decisions because I had deferred to Mr. Leffler thinking that would be more appropriate.

Filderman acknowledged that many of the issues with which they dealt were unique to Tennessee law. Although they had discussed the fact of the anonymous jury, this was not raised as an issue in the motion for a new trial or on appeal. Filderman related, however, that if the petitioner had requested or insisted upon this being raised as an issue, they would have done so. He recalled some discussion about a juror who lived in the same neighborhood as the petitioner's family. He and Leffler had numerous conversations with the petitioner's family members regarding this matter but could not recall if the issue regarding Juror 121 was discussed.

Appellate counsel discussed issues relating to the security measures employed at trial. Filderman opined that "the [S.W.A.T.] team and all of the added security [were] unnecessary and prejudicial," but he could not recall whether this issue was raised in the motion for new trial.

Filderman said that he and Leffler spent "numerous hours, day, weeks, months, reviewing the lengthy transcript and records of this case."

Filderman said that the petitioner wanted to focus on the issue of the superseding indictment, and he and Leffler spent much time working on this issue. Filderman related that, subsequent to his argument before the Court of Criminal Appeals, he met with the petitioner, who had "nothing but praise" for Filderman.

Patsy Weber testified that, at the time of the petitioner's trial, she was employed as a trial consultant and was appointed by the court to assist the petitioner in jury selection. In assisting the petitioner, Weber prepared an opening statement and questions for him to ask the jurors. She had the petitioner practice asking jury questions and reading the statements she prepared for him. She also advised him during the trial.

Weber said that on April 24, 1996, she telephoned the trial judge to inform him that the petitioner's mother suspected that one of the jurors was her neighbor. The trial judge told her she had done the "right thing." Upon the advice of an attorney, Weber drafted a letter to the trial judge outlining the telephone call but never sent it to him and had no knowledge as to what he did with the information she provided.

Weber described the atmosphere surrounding the petitioner's trial:

> The atmosphere was very tense. When you walked into the hallway out there, there was crime scene tape around it. You walked through metal detectors which was very unusual then. . . . And then you walked into the courtroom and everything was very tense, very silent, very solemn.
>
> . . . .
>
> There were more officers than usual. And there were other officers . . . besides the . . . Shelby County Sheriffs because I saw officers dressed in navy. And there were officers on each side of the judge's bench . . . stationed there as well as at the door, and the door, and over there. They [sic] were more than usual.

Glenn Wright testified that he was appointed in December 1994 as an attorney/investigator, along with Coleman Garrett. He was permitted to withdraw on June 23, 1995. Wright did not interview any witnesses and visited the petitioner one time. No mitigation investigation was undertaken by Wright. He explained that he and Garrett went to the jail to see the petitioner, who afterwards attacked Garrett by sending a letter accusing Garrett of making homosexual advances toward him. This letter effectively destroyed the attorney-client relationship. They then sought to withdraw from the petitioner's case. From Wright's recollection, "there [was] no time to engage in any type of representation of [the petitioner] on [his] part."

Coleman Garrett testified that he spent 97.5 out-of-court hours and 28.5 in-court hours on the petitioner's case but had no recollection of meeting with any witnesses. He recalled that the petitioner had urged him to get the jail law library records to show that he and Alfredo Shaw were never in the library at the same time. Garrett remembered talking to members of the petitioner's family but could not recall "any specifics that was done documenting mitigation." However, he said mitigation preparation would "definitely" have been a part of the case preparation. Garrett stated that there were serious communication problems from the outset with the petitioner who had specific ideas as to how he wanted his case handled.

On cross-examination, Garrett testified that, before he was appointed by the court, the petitioner's mother contacted him and asked him to visit the petitioner. At this meeting, the petitioner was very angry and upset that Garrett was present. Regarding his representation of the petitioner, Garrett said that he had numerous meetings with the petitioner and had issued subpoenas, including one to the chief jailer.

Garrett explained the circumstances leading to his eventual withdrawal from representation. He said that the petitioner had made personal attacks on his character and allegations of misconduct. Members of the defense team wanted to be relieved because of threats and allegations of misconduct by the petitioner. The petitioner's actions made it very difficult to go forward with preparing the case. Garrett testified that, had he remained on the case, he would "have done everything that [he] thought necessary and proper to muster a defense on [the petitioner's] behalf." He explained that it was "somewhat impossible to prepare for this case because of lack of cooperation, because of communication problems, because of team members' attitudes about whether they wanted to continue on the case, and it was a difficult situation." If he had stayed on the case, he "certainly would have put together any necessary experts, retained necessary experts, would have prepared for mitigation in this situation, and would have been prepared to put forth the best defense that [they] could put together on [the petitioner's] behalf notwithstanding the fact that this was a very difficult situation to deal with."

Harold Archibald testified that he was appointed to assist in the representation of the petitioner's codefendant, James Montgomery. He explained that he was second chair, and another attorney was appointed as lead counsel. Regarding the atmosphere of the trial, Archibald described it as having "[h]eavy security[;] [a]s a matter of fact there was more security in this trial than any other trial [he] had participated in." He stated that there were armed plain clothes officers in the courtroom and S.W.A.T. team members outside the courtroom. Archibald said that he sat next to the petitioner during the trial and that the petitioner "behaved himself." Archibald stated that, in his opinion, the petitioner was not competent to act as his own counsel.

Craig Morton, II testified that he was appointed as second chair counsel to represent the petitioner. He was appointed on August 12, 1994, and permitted to withdraw in June of the following year. During the ten months that he represented the petitioner, Morton spent 213 hours on the case. He interviewed witnesses and discussed Alfredo Shaw with lead counsel, Larry Nance. Morton agreed that he had a "fairly decent working relationship" with the petitioner and said that the

petitioner even had his home telephone number. He added that the petitioner was very demanding, explaining that, if counsel did not immediately react to one of his demands, the petitioner became very frustrated. Morton said that he, Glenn Wright, and Coleman Garrett met with the trial judge about withdrawing from the case, but he could not remember if a court reporter or a member of the district attorney general's office was present.

John Billings, a private investigator, testified that in January 1996, the trial court authorized the petitioner to employ him. At the time, his agency, All Pro Investigations, employed seven investigators. Prior to his appointment, he had worked for another firm on Jonathan Montgomery's case. At the time of his appointment, Billings had worked on fifteen to twenty capital cases. Billings was the third investigator assigned to the petitioner's case, and he requested the information from the two prior investigators. He eventually received two pages of investigatory work from Randy Anderson but nothing from Glenn Wright. He described this work as "some of the 'poorest quality work' [he] had ever seen." A review of the prior investigatory work revealed that out of a pool of 170 to 180 witnesses, statements had been taken from only six or seven. Billings also received some work from Curtis Lowell, the investigator on James Montgomery's case. Billings said that he and his colleagues spent approximately 400 hours on the petitioner's case. He obtained seventy-five witness statements and knew of no reason why his predecessors could not have done the same work he did.

Billings testified that the trial court appointed Dr. Blake, a forensic pathologist, to assist the petitioner's defense. He related that Dr. Blake's office was in Morristown, Tennessee, a five-hour drive from Memphis. It was Billings' understanding that he could not receive any information from Dr. Blake unless the trial court approved it. Billings was finally able to briefly speak to Dr. Blake before the start of the trial, and Dr. Blake implied that he was not aware that the petitioner was representing himself at trial. He said that they finally served a subpoena on Dr. Blake, but the petitioner ultimately did not call him as a witness.

Billings testified that "[t]hings were a bit tight in the courtroom." He explained:
[The trial judge] had had death threats and tires slashing and a lot of things. He had – my kids attended the same school and he had a body guard with the children in the class rooms which . . . his life was tumultuous. And he and [the petitioner] didn't seem to get along very well. . . .

He described the courtroom as "unlike anything [he had] ever seen," saying it was "intimidating, frightening, looked like something was going to happen." He related that there was yellow crime scene tape, a metal detector, three guards by the metal detector, and S.W.A.T. team members with cobra emblems and bulletproof vests and that, at times, as many as eleven deputies were in the courtroom.

Billings said that he wrote the trial judge expressing his concerns: (1) he was having serious problems getting to see the petitioner; and (2) the petitioner was being handcuffed and shackled when brought in for visitation. He acknowledged that on April 19, 1996, a Shelby County deputy

jailer was gunned down in his driveway. After that incident, all access to the petitioner was stopped. While the petitioner was initially the focus of the investigation of that shooting, ultimately, the investigation led to the arrest of a female deputy jailer.

Billings testified that he interviewed Alfredo Shaw who was a "fourteen time snitch." Billings stated that there was no possibility that the petitioner and Shaw were in the law library at the prison at the same time. After the interview, Shaw was willing to testify for the petitioner. The petitioner also wanted Billings to locate alibi witnesses, but he was only able to locate a small percentage of those witnesses because, in his view, "most of them did not want to be found." He later learned that the witnesses were being threatened by an opposing gang, the Gangster Disciples.

Regarding trial strategy, Billings stated that they focused on the statements of Jonathan Montgomery which implicated several individuals. He later received information from a federal witness, Michael Holmes, in a major cocaine case that led to a new strategy and the investigation of new individuals. The petitioner's alibi witnesses included Adolpho James who testified that he was with the petitioner in the "wee morning hours of [February] 25th." Billings explained that Holmes knew the victims and was the courier between the Columbians and the Smoky City People, who were all dealing in cocaine. Billings testified that he received little assistance from the petitioner's appointed counsel. He said that, due to the time constraints between the time of his appointment and the time of the trial, he was unable to complete the investigation as thoroughly as he desired.

Billings described the petitioner as "very intelligent and very interested in this case and quite knowledgeable." He said that he and the petitioner never had any problems, but his relationship with the trial judge had eroded by the end of the trial and the judge had impeded his ability to properly investigate the case and confer with the petitioner. He explained that the trial judge denied some billing charges and refused to address problems at the jail.

William Massey testified that he and Harry Sayle were appointed to represent the petitioner by order entered on August 11, 1995, but issued nunc pro tunc to July 27, 1995. Massey was released from further representation of the petitioner on January 9, 1996. He agreed that a trial date of January 8, 1996, was "extraordinarily quick" in a capital case.

Massey recalled that the State's witness list was three to four pages long and that, at the time of his appointment, none had been interviewed. He confirmed that he worked approximately 125 hours on the petitioner's case. Several witnesses were interviewed by the investigators. Massey did not know that the investigator at that time, Randy Anderson, was not licensed in Tennessee. He also was unaware that Anderson had only interviewed one witness but said that codefendant Montgomery's investigator had done "a good bit" of investigation and shared that information with him.

Massey stated that he visited the petitioner more than three times at the jail and visited with him on days of hearings. He received numerous telephone calls from the petitioner who was "very upset" and "often said [his case] wasn't prepared or wasn't investigated." The petitioner also wrote

several letters to Massey which, as the trial date approached, became "more harsh," with much of the content directed at Massey himself rather than the case. In a letter dated December 7, 1995, the petitioner told Massey, "You are one white boy I don't even worry about. Your brains are going to get your slick racist ass in a whole lot of trouble. All I tell you is to do you want [sic] to do, and I'll do what I HAVE TO DO! Point blank!" The petitioner also made statements about the car belonging to Massey's daughter, and his telephone calls to Massey's office caused Massey's secretary to "collapse[]." As a result, Massey felt threatened and "compromised as a lawyer." Massey said that, at the same time as his motion to withdraw from further representation was filed, he asked for a ballistics expert and a mitigation expert. Massey said that the trial court granted funding for both a ballistics expert and a mitigation specialist.

Regarding the petitioner's representing himself, Massey said that he was concerned about the fairness of making a defendant represent himself in a capital case. During jury selection, the petitioner and Montgomery asked Massey to come back and help with the case, and Massey informed the trial judge that he was willing to represent the petitioner even though he felt "compromised." However, the trial judge would not allow him back on the case.

Harry Sayle testified that he was appointed second chair counsel on the petitioner's case and that he reviewed the files and talked to the petitioner about potential experts. The petitioner wanted a forensic pathologist. Sayle recalled that the petitioner filed numerous *pro se* motions, including one requesting DNA evidence. Sayle stated that, after Massey was removed from the case, he, himself, acted as elbow counsel for about a month before he was removed. He said he soon became the petitioner's next target, explaining that, during one telephone conversation, the petitioner "berat[ed] and holler[ed] at [him] and demeaning in ways that . . . were unacceptable." The petitioner also called Sayle's daughter on two occasions, frightening her "rather significantly." Sayle said that the petitioner refused to listen to "anything any of the lawyers had to say at all." He recalled that, at one meeting, the petitioner and Montgomery "utterly ignored" the attorneys and talked between themselves. The petitioner would not listen to the advice of counsel and criticized counsel for anything they did. Sayle testified that they filed a motion to dismiss the indictment which was denied. He recalled that the petitioner was indicted without being granted a preliminary hearing.

Juror 127 testified that she served as the foreperson of the petitioner's jury and recalled that Juror 121 said he thought he recognized the petitioner's mother as living down the street from him. Juror 127 did not recall an excessive amount of security in the courtroom and said that she did not listen to any radio programming, including the Mike Fleming Show, during the trial. She did listen to the Mike Fleming Show one to two weeks after the trial and called in to the show to discuss the case.

The testimony of Sergeant Aqua Hamilton and Jimmy Maze was introduced by deposition on September 29, 2005. Sergeant Hamilton, an employee of the Shelby County Jail, testified that the visitation records from February 28, 1994, through April 22, 1996, reflected who visited the petitioner and what time they did so. She confirmed the following visits:

03-05-94       7:50 [].m.       Terrance Carruthers (relative)

03-19-96       9:00 [].m.       John Billings (investigator)

04-01-96       10:30 [].m.       Patsy Weber (jury specialist)

Jimmy Lee Maze, a witness at the petitioner's trial, testified that he wrote a letter to the trial court sometime in 2000. Maze stated that he was told by the prosecutor and his attorney that, if he testified at the petitioner's trial, he "would be taken care of." He explained that he had received threats and that they had promised him protection. Maze said that the prosecutor's promise to get a job for him was made only after he had received probation.

Maze explained that, in early 1994, he was arrested for theft of property. In May 1994, he was released on community corrections. This was after he had talked to law enforcement officers regarding the petitioner's case. Maze testified at the petitioner's trial in April 1996. At the time he testified, Maze was again in jail because of three new charges: theft of property, reckless endangerment, and robbery. For those charges, Maze was ultimately convicted and received an effective sentence of six years.

On November 3, 2005, Todd Bille, accepted as an expert in forensic DNA analysis, testified that, in November 2002, he was hired by codefendant James Montgomery to serve as an expert in his case. Bille was asked to examine evidence to determine if there could be potential biological fluids and whether DNA analysis could be performed. Bille examined a total of nineteen items, including Marcellos Anderson's socks, pants, shirt, underwear and belt; Tucker's socks, jeans, belt, shirt, and boots; Delois Anderson's dress and underwear; an unidentified red sock; ties or bindings from Tucker; and a section of a white cloth blanket. From the testing done on these items, Bille prepared a summary report in June 2003 and a final report on March 17, 2005.

Bille reported that samples from the white blanket did not match the DNA of any of the victims, the petitioner, or the codefendants. Bille commented that the tests performed on the white blanket could not have been performed at the time of the trial, but similar tests could have been performed with the same results.

## FINDINGS OF POST-CONVICTION COURT

On February 2, 2006, the post-conviction court entered an order denying the petition for post-conviction relief. Among other things, the post-conviction court found that the petitioner failed to meet the prejudice prong of the Strickland test with respect to his ineffective assistance of pretrial counsel claim; failed to show that appellate counsel were deficient for not raising the petitioner's listed issues on appeal or that he was prejudiced as a result of the issues not being raised; and failed to show that the prosecution engaged in misconduct or that the alleged misconduct affected the outcome of the trial. The post-conviction court noted that there were troubling aspects to the trial

but that they were caused by the petitioner's own actions in forfeiting his right to counsel. The post-conviction court concluded:

> The Court has carefully considered all of the petitioner's claims. There are issues related to the trial of this case that give pause, but when analyzed they all come down to the fact that the petitioner represented himself at the trial and the petitioner made some questionable decisions before and during the trial. He is responsible for the negative impact of his own decisions while acting as his own lawyer. . . . Many of the complaints here simply come full circle. It comes down to the consequences of the petitioner having implicitly waived his right to counsel.
>
> For the reasons expressed above, . . . all claims of the petitioner are found to be without merit.

Thereafter, the petitioner filed a timely appeal to this court.

## ANALYSIS

### I. Post-Conviction Standard of Review

Post-conviction relief is available to a petitioner who establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103 (2006). The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. Id. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the post-conviction court "are entitled to substantial deference on appeal unless the evidence preponderates against those findings." Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001); see also Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review is of purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields, 40 S.W.3d at 458; Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

### II. The Petitioner's Claims Before this Court

#### A. Ineffective Assistance of Counsel

##### 1. Legal Standard

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance

prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052 (1984); see also State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686, 104 S. Ct. at 2064.

"Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000) (quoting Strickland, 466 U.S. at 689, 104 S. Ct. at 2065). When reviewing a claim of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, it is acknowledged that criminal defendants are not entitled to perfect representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996).

In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S. Ct. 838, 844 (1993) (citing Strickland, 466 U.S. at 687, 104 S. Ct. at 2064). That is, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. State v. Nichols, 90 S.W.3d 576, 587 (Tenn. 2002). "A

-42-

reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991); see also Chambers v. Armontrout, 907 F.2d 825, 832 (8th Cir. 1990). When challenging the imposition of a sentence of death, the petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" Henley, 960 S.W.2d at 579-80 (quoting Strickland, 466 U.S. at 695, 104 S. Ct. at 2069).

### 2. Ineffective Assistance of Pretrial Counsel

The petitioner contends that the various attorneys who represented him prior to trial collectively rendered ineffective assistance due to their alleged failure to conduct any meaningful factual investigation or otherwise prepare for trial. He asserts that such deficiencies constituted the constructive complete denial of counsel at a critical stage in the proceeding, sufficient to justify a presumption of prejudice under the standard announced in United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039 (1984). In the alternative, he asserts that pretrial counsel's failure to conduct an investigation or otherwise prepare for trial resulted in actual, demonstrable prejudice under the more familiar Strickland standard. Specifically, he contends that it was pretrial counsel's failure to conduct any meaningful investigation and preparation that directly led to his "involuntary self-representation, with the disastrous results that the [Tennessee] Supreme Court catalogued in its decision on direct appeal."

The State responds by arguing that the petitioner's forfeiture of the right to counsel by his egregious and outrageous conduct necessarily included the forfeiture of his right to effective assistance of counsel. The State acknowledges our supreme court's direct appeal opinion footnote in which it commented that the petitioner retained the right to raise an ineffective assistance claim with respect to any stage of the proceedings where he was represented by counsel. The State contends, however, that under the circumstances of this case, where the petitioner forfeited the right to counsel some four months prior to trial, "it is not possible to gauge the effect of the actions of the various counsel who represented [the petitioner] at the pre-trial stage against the outcome of the proceedings." The State further argues that this case does not fall within any of the narrow situations in which prejudice may be presumed.

### a. Presumed Prejudice

The petitioner first contends that pretrial counsel's failure to conduct any meaningful preparation or investigation meant that he effectively had no counsel during the critical, investigatory pretrial phase of the proceedings. As such, he argues that his case is one in which prejudice may properly be presumed under Cronic, without the necessity of conducting an inquiry into counsel's actual performance or the effect it had on the trial. We respectfully disagree.

In Cronic, the United States Supreme Court identified three scenarios involving the right to counsel where the circumstances are "so likely to prejudice the accused that the cost of litigating

-43-

their effect in a particular case is unjustified." 466 U.S. at 658, 104 S. Ct. at 2046 (footnote omitted). In these circumstances, a presumption of prejudice is justified without the necessity of inquiring into counsel's actual performance at trial. Id. at 662, 104 S. Ct. at 2048. These scenarios are: (1) situations involving "the complete denial of counsel," where the accused is denied the presence of counsel at "a critical stage" in the proceeding; (2) situations where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and (3) situations where "counsel is available to assist the accused during trial, [but] the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Id. at 659-60, 104 S. Ct. at 2047.

The petitioner asserts that pretrial counsel's billing records and testimony reflect that they "did nothing of substance during their respective tenures on the case, apart from routine motion practice, court appearances, obtaining discovery, limited conferences with Petitioner, and interviewing one major prosecution witness, Nakeita Shaw." The record, however, reflects that pretrial counsel actively and diligently worked on the case during their tenures, often in the face of abusive, uncooperative, and threatening behavior on the part of the petitioner. As revealed in both the evidentiary hearing testimony and in our supreme court's direct appeal opinion summary of counsel's representation, pretrial counsel, among other things, met regularly with the petitioner, appeared at numerous pretrial report hearings, reviewed discovery, filed and argued numerous substantive pretrial motions, and interviewed a number of potential witnesses. The petitioner may not have been satisfied with the schedule in which pretrial counsel conducted their investigation, but this was by no means a case in which he suffered the complete denial of counsel during a critical stage of the proceeding. Cf. Powell v. Alabama, 287 U.S. 45, 57, 53 S. Ct. 55, 60 (1932) (presuming prejudice based on fact that counsel was not appointed until the morning of trial); Mitchell v. Mason, 325 F.3d 732, 742-44 (6th Cir. 2003) (concluding that the petitioner was constructively denied counsel when counsel only met with him for a total of six minutes and was suspended from practice of law for last month of seven-month pretrial period). Accordingly, we, like the post-conviction court, will review the petitioner's allegations of ineffective assistance of counsel under the familiar Strickland standard, which requires the petitioner to show both a deficiency in counsel's performance and actual prejudice resulting to his case.

### b. Failure to Investigate and Prepare Led to Petitioner's Compelled Self-Representation

In the alternative, the petitioner contends that his various pretrial counsel collectively rendered ineffective assistance under the standards of Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975), and Strickland, 466 U.S. at 686, 104 S. Ct. at 2063-64, in that their failure to conduct any meaningful factual investigation, particularly in the face of a list of 125 potential witnesses, led directly to his "disastrous" and compelled self-representation. The petitioner asserts that there was "nothing remotely resembling pretrial investigation . . . before Mr. Billings' entry into the case on January 16, 1996, eight days after [the trial court] had ordered Petitioner to defend himself *pro se*." We, again, respectfully disagree.

The post-conviction court made the following findings of fact and conclusions of law with respect to the petitioner's ineffective assistance of pretrial counsel claim:

> The Court rejects the petitioner's claim that he is entitled to relief for the failures of his series of appointed counsel.
>
> . . . .
>
> In the Supreme Court of Tennessee decision in this case[,] the court chronicled the succession of lawyers that represented the petitioner prior to his trial in Memphis. . . . This Court heard the testimony of all these lawyers and their efforts to investigate the case and their relationship with the petitioner. There is no doubt that for all of them their efforts and ability to investigate the case were seriously distracted by the petitioner's behavior. . . .
>
> The deficiency in the petitioner's claim is that there was no evidence presented from witnesses to support the contention that the petitioner was prejudiced. In other words, if there were witnesses not found because of a faulty investigation, the court did not hear from those witnesses. . . . [T]he claim of ineffective assistance of counsel prior to trial must fail for failure to prove prejudice.
>
> The one possible exception to the above is the testimony of Mr. Bille as to the DNA evidence. Here, it appears that the petitioner's theory is that competent counsel would have hired a DNA expert and that this testimony would have been helpful to the petitioner at trial. The testimony of Mr. Bille indicated that there was a blanket-like cloth taken from the grave site, and that on this blanket-like cloth blood was found that did not belong to any of the three (3) victims and did not belong to any of the three (3) defendants. The petitioner asserts that this proof is important and that it is exculpatory and possibly could have [a]ffected the results of the trial. The Court disagrees.
>
> The testimony of Mr. Bille and the DNA results are only very minimally helpful to the petitioner. In no way does this evidence negate all other proof in the case and it is rank speculation to assume that this indicates that a third party might have committed this crime. There is no proof as to the age of the blood, or any explanation of how the blood got on the piece of cloth. This evidence does not carry the prejudice prong of the <u>Strickland</u> test.

The record supports the findings and conclusions of the post-conviction court. As noted by the post-conviction court, our supreme court detailed the succession of lawyers who were appointed to represent the petitioner, as well as the major actions each undertook in preparation for the case. The court also chronicled the obstacles that counsel faced in their attempts to investigate and prepare for trial, which took the form of unfounded accusations and personal attacks against counsel and

direct and indirect threats against counsel and counsel's family and employees. Furthermore, while not precluding the petitioner from raising an ineffective assistance of counsel claim in the post-conviction setting, our supreme court concluded that the trial record did not support the petitioner's claim that he was forced to represent himself because his appointed counsel were incompetent:

> [The petitioner] also claims that he was denied due process because he was forced to choose between incompetent counsel and no counsel at all, and he asserts that the trial judge should have held a hearing to determine the validity of his complaints about his attorneys.

> We disagree. There is simply no evidence indicating that any one of the many attorneys appointed to represent [the petitioner] was ineffective. In fact, the record fully supports the trial court's repeated findings that the attorneys were qualified, competent, and highly skilled trial lawyers. The record demonstrates that the trial court closely supervised the case, inquired about defense counsel's progress, allowed [the petitioner] to voice his concerns about counsel, and conscientiously reviewed and considered letters from [the petitioner] containing allegations about his attorneys. Based upon this information, the trial court repeatedly found the attorneys representing [the petitioner] to be competent. Most of [the petitioner's] complaints about his attorneys were outrageous personal attacks that had little or nothing to do with legal representation. Indeed, these allegations were so outrageous that the letters were sealed at trial and remain a sealed exhibit to the record on appeal. Although we have reviewed the letters, it is not necessary to reveal the specific nature of the offensive and unfounded allegations. Suffice it to say that, given the nature of the allegations and the trial court's close and careful supervision of the case, a formal hearing to determine counsel's competency was not necessary.

Carruthers, 35 S.W.3d at 550-51 (footnotes omitted).

The evidence at the post-conviction evidentiary hearing, likewise, fails to show that pretrial counsel were deficient in their investigation or trial preparation or that any alleged deficiencies led to the petitioner's self-representation. Larry Nance and his co-counsel, Craig Morton, filed numerous pretrial motions on the petitioner's behalf, including motions for discovery, for investigative services, for a mental examination, to exclude evidence, for individual voir dire, for impeachment evidence, for a competency evaluation of prosecution witnesses, for another mental evaluation of the petitioner, to dismiss the indictments, to suppress the statements of codefendant Jonathan Montgomery, for a severance, for expert services, and for a notice of an alibi defense. Nance estimated that he met with the petitioner at least a dozen times during the six months of his representation and confirmed that his billing records reflected he had spent approximately 60.15 hours on the case prior to Morton's appointment and 18.9 hours after Morton's appointment. He said that the State did not provide discovery, which included over 100 potential witnesses, until approximately two months before his withdrawal from the case. Nonetheless, during that limited time he was able to locate and interview several witnesses. He also communicated with the co-defendant's counsel and spoke with the

petitioner's family. Morton testified that he spent 213 hours working on the case, during which time he, among other things, interviewed several witnesses and talked at length with the petitioner and his family.

Coleman Garrett, who was appointed as lead counsel when Nance was relieved of representation, testified that he spent 97.5 out-of-court hours and 28.5 in-court hours on the petitioner's case. He said he had numerous meetings with the petitioner and issued several subpoenas, including one to the chief jailer. However, he, like previous counsel, soon became the target of the petitioner's unfounded attacks and accusations, making his work extremely difficult. Garrett testified that it was "somewhat impossible to prepare for this case because of lack of cooperation, because of communication problems, because of team members' attitudes about whether they wanted to continue on the case, and it was a difficult situation." However, he said that had he stayed on the case, he "certainly would have put together any necessary experts, retained necessary experts, would have prepared for mitigation in this situation, and would have been prepared to put forth the best defense that [they] could put together on [the petitioner's] behalf notwithstanding the fact that this was a very difficult situation to deal with."

William Massey, who, along with Harry Sayle, was next appointed to represent the petitioner, testified that he worked approximately 125 hours on the petitioner's case. Among other things, he and Sayle reviewed expert and police reports, interviewed a number of witnesses, met with the petitioner to discuss expert witnesses, requested and received additional funds for investigative services, requested a ballistics and a mitigation expert, and filed numerous pretrial motions. He said they also worked extensively with Montgomery's counsel and investigator, who shared information with them. Sayle testified that the petitioner would not listen to anything he and Massey had to say and appeared to request joint meetings with Montgomery and Montgomery's lawyers simply so that he and Montgomery could get together and talk. Like the petitioner's other counsel, Sayle described abusive and threatening behavior by the petitioner directed toward counsel and counsel's families.

The petitioner contends that the prejudice he suffered from pretrial counsel's alleged deficiencies in investigation and pretrial preparation was his "forced" self-representation. However, it is abundantly clear from the record that the petitioner's compelled self-representation resulted from his own misbehavior and nothing else. All of the counsel appointed to represent the petitioner were competent and experienced trial attorneys who were taking the appropriate steps in their preparation of the case at the time they were relieved from representation. Moreover, the petitioner did not produce any witnesses or evidence that pretrial counsel failed to investigate or uncover that would have altered the outcome of the trial. In this respect, we agree with the trial court that the DNA results of the piece of white cloth, obtained by Todd Bille, were inconclusive and would not have changed the outcome of the trial. In sum, the petitioner has failed to establish that, but for any deficiency on the part of pretrial counsel, the result of the proceedings would have been different or that he would have received a sentence other than death. We conclude, therefore, that the petitioner is not entitled to relief on the basis of this claim.

### 3. Ineffective Assistance of Appellate Counsel

The petitioner next contends that appellate counsel were ineffective for failing to raise several meritorious issues on appeal. Specifically, the petitioner complains that:

1. Appellate counsel's failure to challenge the trial court's interference with the petitioner's relationship with Dr. Cleland Blake as a violation of due process principles constituted ineffective assistance of counsel.

2. Appellate counsel's failure to challenge the trial court's failure to conduct an inquiry in response to information received regarding Juror 121 constituted ineffective assistance of counsel.

3. Appellate counsel's failure to challenge the impanelment of an anonymous jury as a matter of constitutional and statutory law constituted ineffective assistance of counsel.

4. Appellate counsel's failure to raise an issue regarding the extraordinary and excessive security measures implemented during the trial constituted ineffective assistance of counsel.

5. Appellate counsel's failure to challenge the trial court's failure to give an alibi instruction constituted ineffective assistance of counsel.

The same principles apply in determining the effectiveness of both trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel were objectively unreasonable in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that the petitioner's appeal would have been successful before the state's highest court. See, e.g., Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 764 (2000); Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Mayo v. Henderson, 13 F.3d 528, 533-34 (2d Cir. 1994). To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004) (citing Kimmelman v. Morrison, 477 U.S. 365, 375, 106 S. Ct. 2574 (1986)). Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Id. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. Id. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim. Carpenter, 126 S.W.3d at 888 (citing United States v. Dixon, 1 F.3d 1080, 1083 (10th Cir. 1993)).

### a. Dr. Cleland Blake

The petitioner first contends that he was unconstitutionally denied the benefit of an expert witness because the trial court appointed Dr. Blake, who communicated directly with the trial court

instead of the petitioner. He also asserts that the trial court forced him to make an uninformed decision about whether to call Dr. Blake as a witness four days before he had heard the testimony of Dr. O.C. Smith. The State argues that the petitioner was not denied the benefit of an expert witness and, as such, cannot establish either deficient performance or prejudice on the basis of appellate counsel's failure to raise this issue on appeal.

The petitioner complained during voir dire about the trial court's communications with Dr. Blake, asserting that by sending information from the prosecutor directly to Dr. Blake, the trial court had led Dr. Blake to, in the petitioner's eyes, believe that he was working for the trial court and the prosecution instead of for the petitioner. The trial court addressed these concerns:

> I contacted Dr. Blake, obviously, the record will reflect, at your request, to have an independent forensic pathologist review the determination made by the Shelby County Medical Examiner's Office, to see if he or she could come up with a more specific time of death for the three victims in this case.
>
> At Dr. Blake's request I needed some basic summary of facts so that he would have some context in which to review the findings of the medical examiner's office, and toward that end I asked [the prosecutor] to provide me with a general summary of what the State felt the facts were so that he, Dr. Blake, could have some factual context in which to conduct his analysis.
>
> There has never been any question in my mind on Dr. Blake's behalf with regard to the fact that he has been retained at taxpayers' expense by me on your behalf as an independent expert to review the findings of the Shelby County Medical Examiner's Office.
>
> . . . .
>
> You think that all he needed was what was in the file or what came from Dr. Francisco's office, but that's not what he thinks. He asked me to prepare him a factual summary of the case so he could operate . . . within some factual context.
>
> And so the record should reflect that all of this came from him. He asked for other information from Dr. Francisco's office, and again, on your behalf and on his behalf I told him to feel free to contact them. I mean, he is contacting a lot of people in an effort to reach this decision that you're seeking. And so he's, in trying to reach this independent decision that you're asking for, it's necessary for him to contact a lot of people to get the information needed to make an informed decision.

The post-conviction court determined that the petitioner's claims with respect to this issue were without merit:

Petitioner now makes much of the role of the trial judge in relation to Dr. Blake and infers that his involvement interfered with the petitioner's ability to prepare for trial and to rebut Dr. Smith.

The record shows considerable confusion about the role of Dr. Blake. Was he an "independent" expert (See T.R.E. 706) or a defense expert? . . . It was obvious that when Dr. Blake testified in the post-conviction case he was still unclear as to whether he was working for the court or for the [petitioner]. . . . While all this confusion may have resulted from an informality with normal procedures and role definitions it had no impact on the end result. Dr. Blake submitted a report and offered an opinion about the time and manner of the death of the victims, referenced above, and all that was available to the petitioner before trial.

Perhaps the actions of the trial judge were unusual, but this was an unusual situation and it appears that the trial judge was attempting to obtain an expert for the petitioner. As it turned out, Dr. Blake's findings were communicated to [the petitioner] and [the petitioner] made the decision not to call Dr. Blake. This now appears to have been a bad decision and may have deprived [the petitioner] of testimony which would have rebutted Dr. Smith. A criminal defendant who represents himself cannot complain about his bad judgments. See State v. Carruthers, 35 S.W.3d at 551. The Court would also note that at no time after Dr. Smith's testimony did the petitioner request that Dr. Blake be called in rebuttal.

We conclude that the evidence does not preponderate against the findings and conclusions of the post-conviction court. At the petitioner's request, the trial court provided him with a qualified forensic pathologist to review the findings of the Shelby County Medical Examiner's office and to prepare an independent cause-and-time-of-death report. While the trial court initiated the contact with Dr. Blake and facilitated his access to needed information, the court made it clear to the petitioner that he and his investigator were free to contact Dr. Blake directly and that he could communicate directly with the petitioner if he wished. The trial court also made Dr. Blake's report and findings available to the petitioner several weeks prior to the start of the trial. Nowhere in the record is there any indication that the prosecution communicated directly with Dr. Blake. The petitioner was given the opportunity to call Dr. Blake as a witness at his trial but opted not to do so, apparently on the advice of one of his investigators.

The petitioner additionally complains that the trial court interfered in his relationship with Dr. Blake by "forcing" the petitioner to decide whether to call Dr. Blake as a witness when he had not yet had the benefit of Dr. Smith's surprise testimony that all three victims had been buried alive. We respectfully disagree. During a break in the trial, the trial court asked the petitioner to decide if he wanted Dr. Blake as a witness, informing him that Dr. Blake had a tight schedule and needed time to make the necessary arrangements to attend the trial. The trial court told the petitioner that he would have Dr. Blake there if the petitioner wanted him, but, barring some "brand new, surprising, novel revelation" by Dr. Smith or any other medical expert called by the State, the court expected the

petitioner to put Dr. Blake on the stand if he went to the trouble and expense of coming to Memphis for the trial:

> [Y]ou know generally what he [Dr. Smith] is going to testify to, generally what his findings are, generally what his conclusions are, generally what the videotape from the crime scene reveals, and so -- and you have two or three communications, several communications from Dr. Blake, both sent to me and his direct communications with Mr. John Billings, Mr. Richard Billings, Mr. Les Arms, all of which should provide you with ample information to make your decision today as to whether you plan to put him on the stand or not.
>
> If you don't want to put him on the stand, I want to notify him today so that he can go on about his business and not worry about making arrangements to come to Memphis, Tennessee, next week.
>
> If you do want to put him on the stand, that's no problem. We will have him here.
>
> But if we get him all the way down here next week, then unless there is some dramatic last second surprise in the medical testimony presented by the State, I expect him to be put on the stand. I don't want . . . to play games with regard to getting him down here and then not putting him on the stand. That's my statement.

As noted by the post-conviction court, the petitioner never requested that Dr. Blake be called in rebuttal following Dr. Smith's testimony that all three victims were buried alive. Given the trial court's statement that it would allow the petitioner to change his mind about putting Dr. Blake on the stand should there be a dramatic last minute change in the State's medical evidence, we have no basis to conclude that the trial court would not have allowed the petitioner to call Dr. Blake in rebuttal had the petitioner made such a request. Additionally, the petitioner did not call Dr. Blake as a witness during the penalty stage of the trial, when his testimony that the two male victims were not buried alive and the female victim was probably unconscious at the time of her burial might have been relevant to refute the aggravating circumstance that the murders were especially heinous, atrocious, or cruel. We conclude, therefore, that the record supports the determination of the post-conviction court that the petitioner has not met his burden of showing that appellate counsel were deficient in not raising as an issue on appeal the trial court's alleged interference in the petitioner's relationship with Dr. Blake, or that the petitioner was prejudiced as a result of that alleged deficiency in representation.

### b. Juror 121

The petitioner next contends that appellate counsel should have raised as an issue on appeal the trial court's failure to inquire into the alleged bias of Juror 121. The petitioner argues that the trial court's failure to inquire into Juror 121's alleged bias was *per se* prejudicial and, in the alternative,

that an unrebutted presumption of prejudice arose when Juror 121's potential bias was disclosed. The State responds that the petitioner cannot show that appellate counsel were deficient for failing to raise the issue or that their failure to raise the issue changed the outcome of the trial.

During the trial, as we have set out, the petitioner's mother informed Patsy Weber, the jury consultant appointed to assist the petitioner, that she had recognized Juror 121 as her neighbor. Weber, in turn, advised the trial court, which made no response until approximately two days later, after closing argument was completed. At that point, the trial court held a bench conference, attended by the petitioner, and stated the following:

> But before I dismiss the alternates I want to just let you know, not that it has necessarily raised any concern on my part, but since the jurors were anonymous, listed only by number, I got a phone call from Patsy Weber, who is the jury consultant for [the petitioner], and she told me that she got a call from [the petitioner's] mother indicating that one of the jurors apparently lives down the street from her. It's a man on the jury. And in her opinion, she doesn't know him personally. She's said hi to him before. He moved onto that street after [the petitioner] was off in custody, and so he would not have had a reason to see [the petitioner] on that street. He may or may not know who she is. She is not sure.

The trial court told the parties that the court had not heard anything from the juror "indicating that he knows her or realizes that she lives on the same street or anything of that sort." One of the prosecutors then expressed his opinion that the juror should not be voir dired on the subject since he had never indicated he knew the petitioner's mother and to question him about the relationship would only serve to draw his attention to the matter. The trial court agreed:

> THE COURT: Right. I don't have any reason to suspect that he has knowledge of this situation or that he has in any way been compromised as a juror. I just wanted to put it on the record so that you-all would know that I received this phone call.

At that point, one of codefendant Montgomery's counsel expressed his concern that a potential problem might arise at the penalty phase should the petitioner call his mother as a witness:

> [CODEFENDANT'S COUNSEL]: My only concern, Judge, is if we end up in stage two and [the petitioner] should call his mother to the stand to testify, then where does that put us? That's the only question. By then the alternate will be gone, and then what? That's the only concern that I would have.

> THE COURT: Well, that's a valid point, although based on what Ms. Weber told me, and my only observation on that is, based on what she said, [the petitioner's] mother indicated that they didn't know each other personally and . . . he may not even recognize her. They have waved from time to time. But she told Ms. Weber, these

are Ms. Weber's exact words, that, "The neighbors on that street are not close, they don't socialize or fraternize or get together, and so it's not a friendship or any relationship of that sort."

So I think it's a valid point you raised. I don't think it is. I'm still not concerned enough to go further with it. So I just wanted –

[THE STATE]: I think they have all taken an oath to judge the case on law and evidence, and it would be akin to one of those situations where most of the parties and jurors are at least acquainted with one another.

[THE STATE]: When did Ms. Weber bring this up?

THE COURT: She brought it up a couple of days ago, but in any event.

[THE STATE]: Well, he hasn't mentioned anything.

THE COURT: No, no one has.

[THE STATE]: Let's just go forward.

THE COURT: All right. Okay. Bring in the jury, please.

None of the parties requested to *voir dire* the juror about the issue, and none raised any further objections to the juror's continued presence on the jury. During the penalty phase of the trial, however, counsel for Montgomery informed the trial court that they had just learned that Juror 121 lived only two doors down from Ms. Carruthers and thus were moving for a mistrial. The trial court denied their request based on the fact that no evidence had been presented to suggest that Juror 121 was prejudiced against the petitioner or his family.

Citing Ricketts v. Carter, 918 S.W.2d 419 (Tenn. 1996), the petitioner first argues that the trial court had an affirmative duty to voir dire Juror 121 about his relationship with the petitioner's family regardless of whether voir dire was requested by the parties. The State responds that the trial court was under no affirmative duty to conduct an independent voir dire of the juror because, unlike the situation in Ricketts, there was nothing in the information presented to the trial court that raised any question of the juror's impartiality.

Ricketts was a negligence case in which the plaintiff sued for injuries, including neck injuries, that she sustained while a passenger in an automobile that collided with the defendant's automobile. Id. at 420. After the parties had rested their cases, but before they had delivered closing arguments, one of the jurors was involved in an automobile accident in which she sustained neck injuries. Id. Because the juror had just suffered the same injury as the one alleged by the plaintiff, the defendant's counsel requested that the trial court either voir dire the juror about the circumstances of her accident

or allow him to do so. Id. The trial court refused the request, questioning the juror not about the circumstances of her accident but instead about whether she felt mentally and physically capable of continuing with the trial. Id. at 420-21. On appeal, our supreme court rejected the plaintiff's arguments that a juror could not be examined for bias after the jury has been impaneled or that the error in the case was harmless. Id. at 422-24. The court concluded that the trial court had committed reversible error by not questioning the juror to determine if her accident had affected her ability to deliver an impartial verdict:

> In summation, we hold that after a jury has been empaneled and a juror has been involved in an accident similar to that suffered by the plaintiff, the trial court should inquire into the juror's impartiality. Such an inquiry should be limited to issues or events that have occurred since the jury was empaneled. Therefore, because the trial court here failed to determine whether Juror Smith could weigh the evidence impartially, the judgment of the Court of Appeals is reversed and the case remanded for further proceedings in accordance with this opinion.

Id. at 424.

We agree with the State that Ricketts is inapposite to the case at bar. The information imparted to the trial court by Ms. Weber, that the petitioner's mother had recognized Juror 121 as her neighbor but did not know if he recognized her, was not enough to raise a question as to the impartiality of Juror 121. The record is clear that, at that time, there were no allegations that Juror 121 disliked the petitioner's mother or had called the police to complain about various activities of the petitioner's family members. Without more, the trial court was under no affirmative duty to independently voir dire the juror.

The petitioner also contends that the information that Juror 121 lived on the same street as the petitioner's mother raised a presumption of prejudice which was not rebutted by the State. Again, we disagree.

Challenges to juror qualifications generally fall into two categories: *propter defectum* or *propter affectum*. Carruthers v. State, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003). General disqualifications such as alienage, family relationship, or statutory mandate are classified as *propter defectum*, "on account of defect," and must be challenged before the return of a jury verdict. Id. (citing State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993)). However, an objection based upon bias, prejudice, or partiality is classified as *propter affectum*, "on account of prejudice," and may be made after the jury verdict is returned. Id. (citing Akins, 867 S.W.2d at 355). "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the Defendant to show that a juror is in some way biased or prejudiced." State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993) (citing Bowman v. State, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980)).

In Akins, this court addressed the issue of a juror's failure to disclose information reflecting potential bias or partiality and stated as follows:

We hold that when a juror's response to relevant, direct voir dire questioning, whether put to that juror in particular or to the venire in general, does not fully and fairly inform counsel of the matters which reflect on a potential juror's possible bias, a presumption of bias arises. While that presumption may be rebutted by an absence of actual prejudice, the court must view the totality of the circumstances, and not merely the juror's self-serving claim of lack of partiality, to determine whether the presumption is overcome.

867 S.W.2d at 357. The court also stated that the "integrity of the voir dire process depends upon the venire's free and full response to questions posed by counsel. When jurors fail to disclose relevant . . . information, counsel are hampered in the jury selection process. As a result, the defendant's right to trial by a fair and impartial jury is significantly impaired." Id. This presumption of bias, however, may be dispelled by an absence of actual favor or partiality by the jury. Id. at 355. The petitioner bears the burden of providing a *prima facie* case of bias or partiality. Id.

Even without a showing of actual bias, a juror's failure to truthfully answer questions about the juror's association with a party, a witness, or one of the attorneys may raise a presumption of bias. In Tennessee Farmers Mutual Ins. Co. v. Greer, 682 S.W.2d 920, 923 (Tenn. Ct. App. 1984), the potential jurors were asked on voir dire if they or any members of their families knew or were related to any of six named witnesses. No potential juror gave an audible answer to the question. During the course of the trial, the chancellor became aware that one of the jurors was familiar with a witness because her son worked with him, but the chancellor did not inform the attorneys of this fact. On appeal, the court of appeals noted that deliberate withholding of information amounts to false swearing and raises a presumption of bias and partiality. Id. at 924. The appellate court concluded that the trial court committed reversible error by not informing the attorneys about the juror's relationship to the witness and by failing to take whatever action was necessary to insure a fair and impartial jury. Id.

In this case, by contrast, there was no allegation that Juror 121 failed to disclose any association with the petitioner's family during voir dire or that any question was asked that should have triggered such a response from him. Indeed, the petitioner's mother testified that she was not even present during voir dire. Furthermore, there was no proof that Juror 121 knew or recognized the petitioner. The trial court relayed the information regarding Ms. Carruthers' identification of Juror 121 as a neighbor to all the parties, including the petitioner, during the bench conference prior to jury deliberation. The petitioner neither requested to voir dire Juror 121 nor raised any objection to his continued presence on the jury.

During the post-conviction hearing, Juror 121 denied knowing Ms. Carruthers. Arguably, this testimony was impeached by Juror 127, who stated that Juror 121 told her during the trial that he thought he recognized the petitioner's mother. Juror 127 testified, however, that Juror 121 did not say anything negative about the petitioner's mother and never indicated that he knew the petitioner. While the petitioner's family made numerous allegations that Juror 121 had accused them of wrongdoing in the neighborhood, Juror 121 testified that he could not recall having ever called the

police to complain about either a neighborhood party or someone's having run over his mailbox during the summer of 1992. Juror 121, in fact, testified that he later learned that an elderly member of his church had accidentally hit the mailbox while driving down his street. In sum, the proof did not establish that Juror 121 knew the petitioner or was biased against him or his family. The fact that a juror knows a family member of a defendant fails, by itself, to establish bias or partiality. As this court has recognized in a similar case, "Tennessee courts have routinely refused relief in post-verdict propter affectum challenges in cases where there was a casual relationship not disclosed during voir dire or the record failed to reveal an inherently prejudicial relationship or a false answer." State v. Joseph Angel Silva, III, No. M2003-03063-CCA-R3-CD, 2005 WL 1252621, at *6 (Tenn. Crim. App. May 25, 2005), perm. to appeal denied (Tenn. Oct. 17, 2005) (citations omitted). We conclude, therefore, that the record supports the determination of the post-conviction court that the petitioner has not met his burden of showing that appellate counsel were ineffective in not raising this issue on appeal.

### c. Anonymous Jury

The petitioner next argues that appellate counsel were ineffective for failing to challenge the impaneling of an anonymous jury.

There was no precedent in Tennessee for impaneling an anonymous jury at the time of the petitioner's trial. Since that time, however, our supreme court concluded in State v. Ivy, 188 S.W.3d 132, 143 (Tenn.), cert. denied, ___ U.S. ___, 127 S. Ct. 258 (2006), that anonymous juries do not *per se* violate a defendant's right to a fair and impartial trial and that it is within a trial court's discretion to determine whether an anonymous jury is appropriate in any particular case. In analyzing this issue, our supreme court first found that nothing in our statutes or constitution prohibits the impaneling of an anonymous jury in Tennessee. The court then turned to a review of other jurisdictions, noting that "nearly every court that has addressed the issue has recognized that anonymous juries may be impaneled in an appropriate case without violating a defendant's constitutional rights under the United States Constitution." Id. (citing United States v. Talley, 164 F.3d 989, 1001 (6th Cir. 1999); United States v. Edmond, 52 F.3d 1080, 1090 (D.C. Cir. 1995); United States v. Ross, 33 F.3d 1507, 1519 (11th Cir. 1994); United States v. Crockett, 979 F.2d 1204, 1215 (7th Cir. 1992); United States v. Scarfo, 850 F.2d 1015, 1021 (3d Cir. 1988); United States v. Barnes, 604 F.2d 121, 140 (2d Cir. 1979)).

The Ivy court acknowledged that the impaneling of an anonymous jury "requires a court to 'balance the defendant's interest in conducting meaningful voir dire and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict.'" Id. at 144 (quoting United States v. Amuso, 21 F.3d 1251, 1264 (2d Cir. 1994)). The court, therefore, adopted the two-prong framework used by other courts for determining the appropriateness of an anonymous jury in any particular case: (1) whether there is a strong reason to believe that the jury needs protection; and (2) whether reasonable precautions will minimize prejudice to the defendant and ensure that fundamental rights are protected.

In determining whether the circumstances support a finding that the jury needs protection, a court may consider a defendant's alleged participation in organized crime, a defendant's alleged participation in a group with the capacity to threaten jurors, a defendant's past efforts to interfere with the judicial process, the defendant's possible punishment if convicted, and the pervasiveness of trial publicity that may reveal the jurors' names and expose them to public scrutiny. Id. (citing Edmond, 52 F.3d at 1091; Ross, 33 F.3d at 1520). Reasonable precautions to minimize prejudice to the accused include enhanced voir dire, instructions to the jury as to neutral reasons for their anonymity, and instructions to the jury on the presumption of innocence. Id. (citing Edmond, 52 F.3d at 1093 (noting that jury was instructed that anonymity was routine); Talley, 164 F.3d at 1002 (observing that jury was instructed that anonymity was due to media interest); Crockett, 979 F.2d at 1216 (noting that jury was instructed on the presumption of innocence).

Applying Ivy to the present case, we conclude that the trial court did not abuse its discretion by impaneling an anonymous jury. First, the trial court had ample reasons to believe that this was a case in which the jurors needed to be protected. The record reveals, among other things, that one of the petitioner's codefendants had been found hanged in his cell prior to trial; the petitioner had repeatedly threatened his counsel and their families and staff; the petitioner had several prior convictions for violent offenses; and books on wire-tapping, explosives, and surveillance methods had been found in the petitioner's cell. A history of violence and attempting to obstruct justice may support a determination that impaneling an anonymous jury is appropriate. Id. at 144-45.

Second, the petitioner was not unduly prejudiced as a result of the anonymous jury. The trial court permitted a lengthy voir dire and allowed the parties to question the prospective jurors extensively. As in Ivy, the trial court instructed the jury that the petitioner was presumed innocent, that the prosecution had the burden of establishing guilt beyond a reasonable doubt, and that the indictment was not evidence. Additionally, the trial court instructed the jurors that they "should have [no] sympathy or prejudice or allow anything but the law and the evidence to have any influence upon them in determining their verdict." Since the jury is presumed to follow jury instructions absent evidence to the contrary, we conclude that these instructions protected against the possibility of prejudice. See id. at 145.

We note that although this case predated Ivy, the trial court, in its decision to impanel the anonymous jury, appropriately balanced the need to ensure the safety and integrity of the trial and all its participants against the potential prejudice to the petitioner:

> I think the record is replete with references of threats and harassment by [the petitioner]. Mr. William Massey filed several affidavits of his own on his own behalf and on behalf of his secretary indicating that he had been threatened personally by [the petitioner], that the car that his daughter drives was specifically identified in one of the threats in a letter authored by [the petitioner], that the color of the toothbrush in his house could be discovered, that he had investigators from out of town that could come in and do all of this work, a threatening call was made to Mr. Massey's office

which resulted in his secretary being reduced to tears because of the threats that were communicated over the telephone. All of this is in the record. This isn't any secret. And there was never any attempt to deny authorship of these letters.

. . . .

It goes back farther than that. Mr. Larry Nance was physically intimidated and threatened sufficiently to cause him to want to get off of the case.

This case is replete with threats and intimidation, and [the petitioner] standing up and saying today that it never happened doesn't change history. And all that has happened, including the books that were found in his cell, tend to indicate that this is a case that should be viewed in a most serious light, that intimidation and threats and bullying tactics have been part of this case from day one.

And what I intend to do is to take every measure possible to reduce that sort of conduct as it may apply to witnesses who come in here to testify and jurors who volunteer their time to sit and serve on this jury. And I may well employ a numbering system for this case.

. . . .

And I guess the argument can be made that it would somehow increase the tension and raise the level of tension in the trial. I guess there are a lot of things that to one degree or another do that. I mean, any time you have a sequestered jury, as opposed to a nonsequestered jury, I guess arguably that would increase the tension and focus the jurors' attention on the case and send a message to them that this is a serious matter, that they should do this or that.

. . . [B]ut that's just a part of the process. And if that's necessary, if that has to be done to maintain the safety and integrity of the system and the safety of the participants, then so be it. In my opinion . . . that would be appropriate.

I can't, you know, getting back to the letter that [the petitioner] sent to Mr. Massey in which he mentioned the car that his daughter drove, I mean, Mr. Massey even indicated in that letter that wasn't even the car he drove. And how [the petitioner] found out about that car, I don't know, but he had some way of finding that out. And those are the types of things that lead me to believe that this is the type of case, given the charges involved, the facts involved, and the lengthy history of intimidation and threats that exist in this case in the record, that this may well be the type of case that some sort of numbering system would be appropriate for.

And I think it would benefit everyone involved in allowing the jurors to feel freer to respond and freer to stay on the case and to listen to the facts of the case and render – and focus on the facts of the case and render a fair and impartial decision.

Accordingly, we conclude the record supports the determination of the post-conviction court that appellate counsel were not deficient by not raising as an issue on appeal the trial court's use of an anonymous jury.

### d. Excessive Security

The petitioner next contends that appellate counsel were ineffective for failing to challenge the excessive security measures used at his trial, which included the use of S.W.A.T. team officers, additional deputies, plain clothes officers, a metal detector, and crime scene tape outside the courtroom. In Holbrook v. Flynn, 475 U.S. 560, 568-69, 106 S. Ct. 1340, 1345-46 (1986), which the petitioner cites in support of this claim, the United States Supreme Court concluded that "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" is not an inherently prejudicial practice. The Court noted that jurors may well either infer that the security personnel are present "to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence," or simply accept them as "elements of an impressive drama." Id. at 569, 106 S. Ct. at 1346. The Court held that when a courtroom security arrangement is challenged as inherently prejudicial, the question becomes whether there is "an unacceptable risk . . . of impermissible factors coming into play." Id. at 570, 106 S. Ct. at 1346-47. The Court explained:

> We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial. But we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section. Even had the jurors been aware that the deployment of troopers was not common practice in Rhode Island, we cannot believe that the use of the four troopers tended to brand respondent in their eyes "with an unmistakable mark of guilt." Four troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings. Indeed, any juror who for some other reason believed defendants particularly dangerous might well have wondered why there were only four armed troopers for the six defendants.

Id. at 571, 106 S. Ct. at 1347 (citations and footnote omitted).

Here, the trial court articulated sound reasons for employing additional security personnel in the courtroom:

> [W]hile it would be nice to not have to worry about any security, while it would be nice to go to the airport and not have to go through a metal detector, and come here

-59-

and not have to go through [a] metal detector, and not have to worry about security, unfortunately, that's not the world we live in, and this case – certainly, if there ever was a case that cried out for security, this would be the case. It's – it is full of instances in which threats have been made, a co-defendant was found hanged in his jail cell. These are facts in the record.

One attorney was threatened so repeatedly and so genuinely by [the petitioner] that he – well, Mr. Nance, the first attorney, was threatened and hassled by individuals sufficiently to cause him to get off the case and Mr. Massey . . . was threatened so repeatedly and so genuinely by [the petitioner] as to cause him to get off the case even after I insisted that Mr. Massey stay on the case.

The Court of Criminal Appeals reviewed the record and determined that the threats were so genuine and so real and so immediate that they reversed me and ordered him off. And then I determined that, well, he should stay on as elbow counsel and the Court of Criminal Appeals reviewed it again and said, no, no, there threats are in fact genuine and real. He needs off the case.

And then we have, of course, the three books that were found in [the petitioner's] cell involving tailing people and tapping telephones and explosives and weapons and things of that sort. I mean, the case is full of reference after reference to violence, threats, intimidation, bullying tactics, and I am determined that the jurors that come over here, two weeks from today, will not be exposed to any sort of misconduct or bullying tactics or intimidation or threats. And as a consequence, I'm going to take whatever measures are needed to make sure that they are well protected and well insulated. We'll try to be discreet[.]

The record fully supports the trial court's finding that additional security was warranted under the circumstances in this case. Furthermore, testimony presented at the evidentiary hearing suggests that the trial court was at least partially successful in its attempt to be discreet in the use of additional security personnel. Although John Billings testified that the security in the courtroom was "intimidating" and "frightening," counsel for Montgomery testified that security was heavier than usual but that he saw nothing about the security detail that would have drawn the jurors' attention. Juror 121 testified that the courtroom atmosphere was "intense" with S.W.A.T. team members present but said that it did not affect his decision-making. Finally, Juror 127 was unable to recall any unusual amount of security at the trial. Accordingly, we conclude the record supports the determination of the post-conviction court that appellate counsel were not deficient by not raising as an issue on appeal the trial court's use of additional security measures.

### e. Alibi Instruction

Lastly, the petitioner contends that appellate counsel were ineffective for not raising as an issue the fact that the trial court did not give an alibi instruction to the jury. The State responds that

the proof did not warrant an alibi instruction and that appellate counsel were therefore not ineffective for failing to raise the issue on appeal. We agree that counsel were not deficient in this regard.

A trial court has the affirmative duty to instruct the jury on every issue raised by the proof, including the defendant's theory of defense, and specifically including alibi. See Poe v. State, 212 Tenn. 413, 416, 370 S.W.2d 488, 489 (1963). The trial court must instruct the jury on the defense of alibi when it is "fairly raised" by the evidence, see Manning v. State, 500 S.W.2d 913, 915 (Tenn. 1973), regardless of whether the defendant requests the instruction. See Poe, 370 S.W.2d at 491. Proof of an alibi sufficient to require an instruction exists where (1) the defendant's claim that he was not at the scene of the crime is corroborated by other credible witnesses; (2) the victim has been unable to identify the defendant; or (3) the proof against the defendant is wholly circumstantial. Manning, 500 S.W.2d at 916. The failure to charge the jury with the defense of alibi when it has been fairly raised by credible evidence is reversible error. Moffitt v. State, 29 S.W.3d 51, 57 (Tenn. Crim. App. 1999).

The post-conviction court determined that this claim was without merit because the testimony upon which it relied for alibi evidence was "vague[] at best":

> The petitioner next argues that appellate counsel should have raised the issue of the failure of the trial judge to give the alibi instruction in light of the testimony of Aldolpho James. Mr. James' testimony is summarized by the Supreme Court as follows:
>
>> Another witness, Aldolpho Antonio James testified that he and [the petitioner] had been visiting a friend between the hours of 1:00 a.m. and 2:00 a.m. the day before these homicides were first reported on the news. This testimony was offered to provide at least a partial alibi for [the petitioner] for the early morning hours of February 25, 1994. However, on cross-examination, James admitted that he did not know the exact date he and [the petitioner] had been together.
>
> Carruthers, 35 S.W.3d at 528. . . . This Court is of the opinion that the appellate court would not have found the failure to give an alibi instruction (which was not requested by the defense) reversible error. Mr. James' testimony was vague, at best, and even if it could be determined to have referenced the date of the crime it was only a "partial alibi."

The petitioner argues that the post-conviction court erroneously relied upon the summary of James's testimony in our supreme court's direct appeal opinion instead of turning to the trial transcript itself, which reveals that James testified that the petitioner was already at the friend's house when James arrived between 1:00 and 2:00 in the morning. The petitioner asserts that this testimony established a "partial alibi" that was "materially more substantial than the [post-conviction] court necessarily viewed it by simply reciting the quotation from the Supreme Court's opinion." The State

responds that James's vague testimony merely established that James had seen the petitioner at some point during the time of the victims' disappearance.

We agree with the State that James's testimony that he had seen the petitioner in the early morning hours of the day before he first heard news reports about the victims' murders was not sufficient to warrant an alibi instruction. James testified that he arrived at a friend's house at about 1:35 or 1:45 a.m. to find the petitioner already there. He further testified that at about the same time that he arrived, someone else arrived to take the petitioner home. James was unable to recall the month or even the day of the week that these events transpired. As the State points out, this testimony merely established that "James saw [the] petitioner for only a few minutes on an undetermined night sometime before James heard the news about the victims' disappearance." We conclude, therefore, that the petitioner has failed to meet his burden of establishing that appellate counsel were deficient for failing to raise this issue on appeal or that he suffered any prejudice as a result of the issue not being raised.

## B. Prosecutorial Misconduct

The petitioner next contends that the prosecution engaged in numerous acts of misconduct which cumulatively deprived him of his right to a fair trial. Specifically, he complains that the prosecution suppressed evidence of the deals it had made with prosecution witnesses, misrepresented the evidence, and knowingly presented perjured testimony to the grand jury. The State responds by arguing that the claims that the prosecution elicited false testimony or presented perjured testimony to the grand jury have previously been determined by our supreme court on direct appeal; the claim that the prosecution misrepresented evidence has been waived for failure to raise it on direct appeal; and the claim that the prosecution suppressed evidence is without merit.

### 1. Alfredo Shaw's Grand Jury Testimony

The petitioner contends that the State had at least constructive knowledge that Shaw's testimony to the grand jury was false. He bases this claim on the fact that Shaw testified that the petitioner implicated himself in the crimes during a conversation that occurred while the men were in the legal room of the Shelby County Jail. According to the petitioner, the jail records indicate that he and Shaw were never together in the legal room of the jail during the relevant time period, a fact which could have been easily ascertained by the prosecutor.

The State may not present false testimony and has an affirmative duty to correct false testimony presented by State's witnesses. State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). However, nothing in the record suggests that the prosecutor knew that Shaw's testimony was false at the time he presented his testimony to the grand jury. In its direct appeal opinion, our supreme court noted that Shaw's testimony at trial was consistent with his initial statement to police and with his testimony before the grand jury. Carruthers, 35 S.W.3d at 529, 532. We conclude, therefore, that the petitioner is not entitled to relief on the basis of this claim.

## 2. Misrepresentation of Evidence

The petitioner next contends that the State misrepresented evidence at trial by asking various questions of Jimmy Maze, Chris Hines, and Dr. O.C. Smith that were improper and prejudicial because there was no factual basis to support the questions posed. The State responds that these claims are waived for failure to raise them on direct appeal or present any evidence in support of these claims. We agree with the State. This court has previously held that "issues [of prosecutorial misconduct] are more properly the subject of a direct appeal and are not properly issues for post-conviction relief." John C. Johnson v. State, No. M2004-02675-CCA-R3-CO, 2006 WL 721300, at *19 (Tenn. Crim. App., at Nashville, Mar. 22, 2006), perm. to appeal denied (Tenn. Aug. 20, 2007). Regardless, we conclude that the petitioner is not entitled to relief on the basis of this claim.

The petitioner bases his claim that the prosecutor misrepresented evidence on testimony elicited from three witnesses: Jimmy Maze, Chris Hines, and Dr. O. C. Smith. He first contends that the prosecutor misrepresented evidence by eliciting testimony from Maze that he had seen the petitioner with three antifreeze jugs on New Year's Eve, 1993, and that the petitioner had told him that the jugs were filled with gasoline. The petitioner agues that the necessary implication of this testimony was that the petitioner later used these jugs of gasoline to burn the Jeep Cherokee found in DeSoto County, Mississippi, which was "improper and extremely prejudicial, as there was no factual basis to support the theory that the gasoline allegedly contained in the antifreeze jugs was used to start the vehicle fire." The petitioner also asserts that the prosecutor improperly asked Maze a question that implied that Maze had been threatened at the jail by the petitioner and his codefendant.

The petitioner contends that the prosecutor improperly elicited testimony from Chris Hines to the effect that the petitioner and Montgomery had offered to sell Hines an AK-47 assault rifle shortly after the date of the crimes and that Montgomery had stated that the weapon had "blood on it," which Hines had interpreted to mean that "somebody had been shot with it." The petitioner argues that this line of questioning created the false impression that the AK-47 had been used to kill the victims, despite the fact that the State knew that the murder weapon was either a .38 caliber or .357 magnum handgun. He asserts that this implication, which was without any factual basis and known by the State to be false, was improper and highly prejudicial to the petitioner.

Finally, the petitioner contends that the prosecutor's conduct in eliciting testimony from Dr. O.C. Smith that the victims were buried alive was without factual underpinning and prejudicial in the extreme. He asserts that the proof at the evidentiary hearing established that there was no basis in the autopsy reports for Dr. Smith's conclusion that the victims were buried alive.

"It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). In determining whether statements made by the prosecutor constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978); Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965). We are guided by such factors as the intent of the prosecutor

in light of the facts and circumstances of the case, the strength or weakness of the evidence, the curative measures, if any, undertaken by the trial court in response to the conduct, and the cumulative effect of the conduct. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Based on our review, we cannot conclude that the prosecutor knowingly misrepresented the evidence in its questioning of these witnesses. Even if we presumed that the questioning was improper, we would conclude that it was harmless beyond a reasonable doubt. Given the rest of the evidence presented by the State and the three additional aggravating circumstances found by the jury, none of the questioned testimony, including Dr. Smith's testimony that the three victims were buried alive, would have changed the verdict of guilt or the sentence of death. Accordingly, we conclude that the petitioner is not entitled to relief on the basis of his claim that the prosecutor misrepresented the evidence.

### 3. Withholding of Evidence of Deals Made with State Witnesses

The petitioner contends that the State improperly withheld evidence of deals it made with prosecution witnesses in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), and Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972). Specifically, the petitioner asserts that the State failed to disclose deals made with witnesses Jimmy Maze and Charles Ray Smith in exchange for their testimony at trial.

The duty to disclose exculpatory evidence extends to all "favorable information" irrespective of whether the evidence is admissible at trial. State v. Robinson, 146 S.W.3d 469, 512 (Tenn. 2004); Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). The prosecution's duty to disclose Brady material also applies to evidence affecting the credibility of a government witness, including evidence of any agreement or promise of leniency given to the witness in exchange for favorable testimony against an accused. Johnson, 38 S.W.3d at 56. Although Brady does not require the State to investigate for the defendant, it does burden the prosecution with the responsibility of disclosing statements of witnesses favorable to the defense. State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984). However, this duty does not extend to information that the defense already possesses, or is able to obtain, or to information not in the possession or control of the prosecution or another governmental agency. State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

Jimmy Maze testified that the prosecution had promised him that he would be "taken care of" if he testified. He said he understood this as a promise to protect him, since his life had been threatened. He further testified that the prosecutor told him after the trial that he would help him get probation for some pending charges. However, he did not know whether the prosecutor ever helped him or not. With respect to this claim, the post-conviction court determined that Maze's deposition testimony "[did] not support a finding that any promise was made related to his April 1996 testimony." The post-conviction court further found that the only evidence of any deal between the prosecution and Charles Ray Smith came from the testimony of Jimmy Maze, which the post-conviction court did not find credible.

The record supports the findings and conclusions of the post-conviction court. Maze's deposition testimony does not support the petitioner's claim that the prosecution entered into an agreement with either Maze or Smith in exchange for their trial testimony. Moreover, we agree with the post-conviction court that even if the State failed to disclose "deals" it had made with Maze and Smith, the error would have been harmless. Both Maze and Smith were heavily impeached at trial by their long criminal records and the pending criminal proceedings against them.

## CONCLUSION

Based upon our review of the record and the applicable law, we conclude that the petitioner has failed to prove the allegations contained in his post-conviction petition by clear and convincing evidence. Accordingly, the judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE